HUGH MAJOR AND CHARLOTTE MAJOR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

SPECIALIZED TRANSPORTATION, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9780–75, 9945–75.     Filed February 17, 1981.

*John A. Farrell* and *J. Thomas Long*, for the petitioners in docket No. 9780–75.

*Michael N. Newmark* and *John P. Barrie*, for the petitioner in docket No. 9945–75.

*William J. Falk*, for the respondent.

FORRESTER, *Judge*: In these consolidated cases respondent has determined deficiencies in petitioners' Federal income taxes as follows:

| Petitioner | Year ending | Deficiency |
|---|---|---|
| Hugh Major and Charlotte Major | Dec. 31, 1972 | [1] $28,803.37 |
| Specialized Transportation, Inc | May 31, 1972 | 6,292.25 |
| | May 31, 1973 | 30,572.23 |

Concessions having been made, the only issue remaining for decision is whether any portion of the sale price of all of the corporate stock of Thunderbird Motor Freight Lines, Inc., must be allocated to a covenant not to compete.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners Hugh Major and Charlotte Major (hereinafter sometimes referred to as the Majors) are husband and wife who, at the time the petition herein was filed, resided in East Alton, Ill. They timely filed their joint Federal income tax return for 1972 with the Internal Revenue Service Center at Kansas City, Mo.

Petitioner Specialized Transportation, Inc. (hereinafter Specialized), is an Illinois corporation with its principal place of business in Madison County, Ill. It timely filed its corporate

---

[1] Of the total deficiency asserted against petitioners Hugh and Charlotte Major, $11,924.20 represents an increase asserted by respondent in an amended answer resulting from an amended petition filed by petitioner Specialized Transportation, Inc., claiming additional deductions, and the fact that respondent has taken inconsistent positions with respect to the corporate and individual petitioners herein.

Federal income tax returns for its taxable years ending May 31, 1972, and May 31, 1973, with the Internal Revenue Service Center at Kansas City, Mo.

Petitioner Hugh Major began a motor transport freight (trucking) business in 1955. In 1961, petitioner Charlotte Major formed Workwell, Inc., for the primary purpose of owning and leasing truck tractors to her husband's business. In 1966, the Majors incorporated Hugh Major's business into Thunderbird Motor Freight Lines, Inc. (hereinafter Thunderbird), an Indiana corporation with its principal place of business, on February 9, 1972, in Crawfordsville, Ind.

In late 1971, Jerry Dean Todd (hereinafter Todd), representing Specialized, contacted William D. Wright (hereinafter Wright), executive vice president of Thunderbird, about the possibility of acquiring Thunderbird from the Majors. Wright arranged a meeting between Todd and Hugh Major which took place in January 1972. At that meeting, Todd offered the Majors $800,000 for all of the stock in Thunderbird, to be paid over a 5-year period. Since Todd was primarily interested only in Thunderbird's operating authority, books, records, and goodwill, it was proposed that prior to a sale of the stock, the Majors would redeem out of Thunderbird all other assets, such as truck trailers. The parties agreed to these primary terms of sale; however, negotiations continued regarding only the fine points to be included in the contract of sale. Both parties were represented by counsel at all subsequent negotiations. One of these items was a covenant not to compete for 5 years, which Todd requested be made a part of the contract. He testified that he would not have paid $800,000 for Thunderbird absent the Majors' covenant not to compete. The Majors agreed to such a covenant without hesitation since neither had any intention of competing in interstate trucking. For this reason, they did not request that any additional money or other concessions be paid in exchange for the covenant. In fact, the $800,000 purchase price agreed to at the initial meeting between Todd and the Majors never varied and was not considered as a subject open for negotiations after that time. There were never any appraisals of Thunderbird or its assets made prior to or during the negotiations leading up to its sale.[2]

---

[2] On Sept. 28, 1979, Specialized caused an ICC attorney, Anthony C. Vance, to appraise Thunderbird as of Feb. 9, 1972, specifically for use in the instant litigation. He valued the

On February 9, 1972, the parties entered into a contract for the sale of Thunderbird. It provided in pertinent part:

### CONTRACT FOR SALE OF CAPITAL STOCK OF THUNDERBIRD MOTOR FREIGHT LINES, INC.

This Contract made and entered into this 9th day of February, 1972, at Indianapolis, Indiana, by and between Hugh Major and Charlotte Major, husband and wife, both of Wood River, Illinois, (hereinafter referred to as "Sellers"), who are the owners of the issued and outstanding shares of common stock of Thunderbird Motor Freight Lines, Inc., an Indiana corporation, (hereinafter referred to as "Corporation"), and Specialized Transportation, Inc., an Illinois corporation with its principal office in East St. Louis, Illinois, (hereinafter referred to as "Buyer"),

### WITNESSETH:

WHEREAS, Sellers are the holders and owners of all the issued and outstanding shares of the common stock of the Corporation, which Corporation holds certain operating authority issued it by the Interstate Commerce Commission in Docket No. MC–125708 and subs thereunder, * * * and

WHEREAS, Sellers wish to sell all of said shares of stock to Buyer and Buyer desires to purchase the same from Sellers, on the terms and conditions hereinafter set forth; and

WHEREAS, both Sellers and Buyer mutually recognize and agree that at the time of the effective date of this contract the only assets of the Corporation are said operating rights, the good will of the Corporation and its corporate books and records, and that no other property or property rights such as, but not limited to, furniture, fixtures, motor vehicle equipment, cash, choses in action or accounts receivable, will at said time be or considered to be an asset of the Corporation; * * *

*     *     *     *     *     *     *

Now, THEREFORE, for good and valuable considerations, receipt and sufficiency of which are hereby jointly and severally acknowledged, the parties promise, warrant and agree as follows:

---

assets of Thunderbird, including its goodwill, at $250,000, or in the range of between $127,500 to $367,805. He considered the value of the covenant not to compete to be the sales price ($800,000) less the value of Thunderbird as appraised ($250,000). We place very little weight on this appraisal. Mr. Vance noted that his appraisal is a mere estimate and that outlandish prices are often paid for operating authorities contrary to his or other appraisers' advice. More importantly, however, are: Mr. Vance's bias, having Specialized as a client in other matters; the fact that he was aware of the nature of this controversy in advance of the appraisal prepared solely for the instant litigation; that the appraisal was made some 7 years after the fact; that the figures used in arriving at his conclusions were severely discredited on cross-examination; and that his conclusion that $550,000 is the value of the covenant not to compete is totally unreasonable in light of the facts presented.

\* \* \* \* \* \* \*

3. The parties mutually agree that the sale price of said shares of stock is Eight Hundred Thousand ($800,000.00) Dollars, \* \* \*

\* \* \* \* \* \* \*

(1) Five Thousand ($5,000.00) Dollars cash shall be paid to Sellers at the time of execution of this agreement \* \* \*

(2) On the effective date, which effective date shall be March 1, 1972, Two Hundred Thirty-five Thousand ($235,000.00) Dollars shall be paid to Sellers and Ten Thousand ($10,000.00) Dollars shall be paid to the Escrow Agent, hereinafter named.

(3) The Five Hundred Fifty Thousand ($550,000.00) Dollar balance of the purchase price shall be paid to the Escrow Agent, hereinafter named, as follows: Commencing forty-five (45) days after the effective date hereof, Buyer shall make fifty-nine (59) consecutive monthly installments in the principal amount of Nine Thousand Two Hundred ($9,200.00) Dollars each, together with interest at the rate of six percent (6%) per annum on the unpaid balance of the purchase price due at the time such installments are paid; and one month next following the last of fifty-nine (59) installments Buyer shall pay the principal amount of Seven Thousand Two Hundred ($7,200.00) Dollars, together with interest at the rate of six percent (6%) per annum on the unpaid balance of the purchase price due at such time. Interest throughout said installments to be computed on the basis of the unpaid principal sum remaining after each principal payment throughout the term of said monthly payments. All such payments shall be made separately as to principal and interest.

\* \* \* \* \* \* \*

8. It is mutually understood and agreed that as of the effective date of this contract the only assets held or possessed by the Corporation are its said Interstate Commerce Commission operating authority, its good will, and its corporate books.

\* \* \* \* \* \* \*

12. It mutually is promised and agreed that, until all payments of the purchase price have been paid in full, the name of Thunderbird Motor Freight Lines, Inc. shall not be changed. Sellers promise Buyer that during the same period of time they will not engage in the business of transportation by motor vehicle in interstate commerce, nor will they finance or help any third person or corporation who would compete, directly or indirectly, with the operations of Thunderbird Motor Freight Lines, Inc.

\* \* \* \* \* \* \*

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals, at the time and place first hereinabove written.

> (S) Hugh Major (Seal)
> HUGH MAJOR
> (S) Charlotte Major (Seal)
> CHARLOTTE MAJOR
> SPECIALIZED TRANSPORTATION, INC.
> By (S) Leon Barnard
> LEON BARNARD

At no time during the negotiations leading up to the execution of the February 9, 1972, contract was there any discussion among the parties or their representatives with respect to whether any portion of the $800,000 purchase price should be allocated to the covenant not to compete contained in the contract.

Prior to April 1972, Todd, acting on behalf of Specialized, was unaware of the tax consequences resulting from an allocation in the contract of a portion of the purchase price to the covenant not to compete, nor was he so advised by his legal counsel even though his attorney, Donald W. Smith, testified that he was so aware at the time the contract was entered into. The Majors, on the other hand, were advised as to the tax consequences of the sale. They were informed by their accountants that the entire transaction would produce only long-term capital gains. In fact, the Majors would not have agreed to sell their Thunderbird stock had they expected any substantial portion of the sales price to be taxed to them as ordinary income.

For at least several months prior to Todd's inquiry into the purchase of Thunderbird, Hugh Major, then 66 years of age, had been experiencing problems with his eyesight caused by a diabetic condition for which he was being treated. He was finding it increasingly more difficult to manage Thunderbird properly. This was particularly true given the nature of Thunderbird as a 24-hour-a-day operation. Not only were Hugh and Charlotte Major at the office all day nearly every day, but the Majors had 11 telephone lines running from Thunderbird's office to their home which they answered nearly all night and on weekends.

Since the sale of Thunderbird, Charlotte Major has continued to operate Workwell, Inc., and in 1974, Hugh Major began a business salvaging trucks. Hugh Major has help operating this business so that he need work only approximately 9 hours per week. He began this business because he "could never sit still" and because he had various contacts in the trucking industry flowing from his 40 years engaged in that business.

Jerry Todd was first advised of the tax consequences of a failure to allocate a part of the purchase price of Thunderbird to the covenent not to compete in March or April of 1972 by his C.P.A., Mr. Faust. Having been so advised, Todd "tried to get him to allocate a half a million dollars" but Faust "suggested that $250,000.00 would be something that the Majors might go along with, rather than half a million." As a result, Specialized deducted $12,500 for the year ending May 31, 1972, and $50,000

for the year ending May 31, 1973, as amortization of the covenant not to compete.[3] On October 13, 1976, Specialized amended its petition with this Court, claiming additional deductions for the years ended May 31, 1972, and May 31, 1973, in the amounts of $7,500 and $30,000, respectively. This amendment was based on its claim that $400,000 of the $800,000 purchase price of Thunderbird should be allocated to the covenant not to compete.

On their 1972 Federal income tax return, the Majors reported all of the sale proceeds as long-term capital gain.

The respondent has taken inconsistent positions and determined deficiencies against Specialized and the Majors. With respect to Specialized, respondent has disallowed the claimed deductions for amortization of the covenant not to compete for its fiscal years ending May 31, 1972, and May 31, 1973. With respect to the Majors, respondent has determined that $400,000[4] of the $800,000 total sales price of Thunderbird is attributable to a covenant not to compete, taxable as ordinary income, rather than as capital gain.

## OPINION

Once again this Court has been asked to determine what amount of a business' sales price, if any, is properly allocable to a covenant not to compete. As is usual, the sellers (the Majors herein) insist that no part of the sales price represented payment for such a covenant, while the purchaser (Specialized herein) seeks a finding that some substantial portion of the purchase price was actually compensation to the sellers for their promised forbearance. To the extent that Specialized is found to have paid for a covenant not to compete, it has purchased an intangible asset, amortizable over its duration (sec. 1.167(a)–3, Income Tax Regs.), and the Majors must recognize ordinary income. *Lazisky v. Commissioner*, 72 T.C. 495, 500 (1979). On the other hand, to the extent that Specialized has paid for stock or goodwill, nonwasting assests, it has acquired a nonamortizable capital asset, the sale of which by the Majors generates capital gain. *Lazisky v. Commissioner, supra.*

This is a typical "whipsaw" case in which the Commissioner, as a stakeholder, is forced to take inconsistent positions, assessing deficiencies against both petitioners. The respondent merely

---

[3]These figures represent an allocation of $250,000 of the purchase price of Thunderbird to the covenant not to compete.
[4]See note 1 *supra.*

seeks to insure the collection of one tax. It is the respondent's contention, however, that absent mutual intent and agreement of the parties to make an allocation to the covenant, this Court should not interpose a binding allocation for tax purposes. Thus, respondent asserts that Specialized cannot deduct amortization of its unilateral allocation to said covenent, and the Majors need not report any proceeds of the sale of their stock as having been received for the covenant not to compete. In cases such as the one at bar involving allocations to a covenant not to compete, the respective petitioners bear the burden of proving that the respondent's determination is erroneous. *Welch v. Helvering*, 290 U.S. 111 (1933); *Wilmot Fleming Engineering Co. v. Commissioner*, 65 T.C. 847 (1976); Rule 142(a), Tax Court Rules of Practice and Procedure.

Over the years, various approaches have been taken by the courts, depending upon the facts of the case and the circuit to which an appeal would lie. See *Lazisky v. Commissioner*, 72 T.C. 495, 500–502 (1979).[5] See also *G C Services Corp. v. Commissioner*, 73 T.C. 406 (1979). This Court favors a rule which places heavy emphasis upon the intention of the parties at the time the contract was entered into. *G C Services Corp. v. Commissioner, supra*; *Lazisky v. Commissioner, supra*; *Lucas v. Commissioner*, 58 T.C. 1022, 1032 (1972); *Rich Hill Insurance Agency, Inc. v. Commissioner*, 58 T.C. 610, 617–619 (1972). Another factor of considerable relevance is whether the covenant has independent economic significance (economic reality). *Lazisky v. Commissioner, supra*. The economic reality test, however, is applied with a view to the parties' intentions, e.g., whether the covenant was separately bargained for. *Lazisky v. Commissioner, supra*; *Rich Hill Insurance Agency, Inc. v. Commissioner, supra*. In appropriate cases, this Court will look beyond the form of the agreement to its substance; however, the underlying philosophy of the "substance over form" doctrine is to prevent taxpayers from attempting to subvert the taxing statutes relying upon mere legal formality. *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Higgins v. Smith*, 308 U.S. 473, 477 (1940); *F. & D. Rentals, Inc. v. Commissioner*, 365 F.2d 34, 40 (7th Cir. 1966). The substance over form doctrine is generally sought by the Commissioner only in rare and extraordinary cases involving covenants not to compete. This is seen from the respondent's persistent attempts to persuade this Court to adopt a rule binding the parties to a contract to its terms

---

[5]See also *Fidler v. Commissioner*, T.C. Memo. 1980–346.

absent "mistake, undue influence, fraud, duress, etc." See *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967); *G C Services Corp. v. Commissioner, supra* at 412 n. 2; *Lucas v. Commissioner, supra* at 1032 n. 1.

We note at this point that it is the position of this Court that the contract in the instant case clearly makes an allocation of the $800,000 purchase price of Thunderbird. The agreement plainly provides that "the parties mutually agree that the sales price of *said shares of stock* is Eight Hundred Thousand ($800,000.00) Dollars." (Emphasis added.) Although the contract contains other covenants, among them the covenant not to compete, no consideration is specified for them. This has been construed as an allocation of all the purchase price to the shares of stock and zero to the covenants. See *G C Services Corp. v. Commissioner*, 73 T.C. 406, 411 (1979).

Not only must petitioners prove that an asserted allocation conforms to economic reality and their intent at the time the contract was entered into, but where one alleges that an allocation is actually other than that contained in a contract, that party must prove it beyond a mere preponderance of the evidence—he must present "strong proof" that that allocation is correct based on the intent of the parties and the economic realities. *Harvey Radio Laboratories, Inc. v. Commissioner*, 470 F.2d 118 (1st Cir. 1972); *Estate of Rogers v. Commissioner*, 445 F.2d 1020 (2d Cir. 1971);[6] *Bennett v. Commissioner*, 450 F.2d 959 (6th Cir. 1971); *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967) (applying a test requiring more than strong proof); *Balthrope v. Commissioner*, 356 F.2d 28 (5th Cir. 1966); *Schulz v. Commissioner*, 294 F.2d 52 (9th Cir. 1961); *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441 (1980); *G C Services Corp. v. Commissioner*, 73 T.C. 406 (1979); *Lazisky v. Commissioner*, 72 T.C. 495 (1979). These rules are necessitated by a general desire to instill a degree of predictability into this area of the law, as well as to guard against a flood of frivolous litigation in cases where one party seeks to obtain a judicial alteration of a

---

[6] At least four circuits have not ruled on the application of the strong proof standard, but in each case the intent of the parties has been held a crucial element in the economic reality test. See *General Insurance Agency, Inc. v. Commissioner*, 401 F.2d 324 (4th Cir. 1968); *Coca-Cola Co. v. Commissioner*, 369 F.2d 913 (8th Cir. 1966); *Wilson Athletic G. Mfg. Co. v. Commissioner*, 222 F.2d 355 (7th Cir. 1955); *Hamlin's Trust v. Commissioner*, 209 F.2d 761 (10th Cir. 1954).

We note that the only situations where the strong proof rule has been held inapplicable is where it is clear that the parties contemplated that an allocation be made but none was expressed in the contract (see *G C Services Corp. v. Commissioner*, 73 T.C. 406 (1979); *Kinney v. Commissioner*, 58 T.C. 1038 (1972)), and where it was perfectly clear to the Court that payment for an item was intended but no allocation was made thereto. See *Eisler v. Commissioner*, 59 T.C. 634 (1973). Cf. *Wilson Athletic G. Mfg. Co. v. Commissioner*, 222 F.2d 355 (7th Cir. 1955).

contract, freely and knowingly entered into, despite the fact that the other party thereto (and the respondent as a stakeholder) is willing to accept the terms of the contract as written. See *Lazisky v. Commissioner, supra.*[7]

In the instant case, Specialized relies on *Wilson Athletic G. Mfg. Co. v. Commissioner,* 222 F.2d 355 (7th Cir. 1955), for the proposition that where no part of the purchase price is allocated to the covenant, pure substance over form reasoning should be used to determine an appropriate allocation. Specialized further asserts that since an appeal in this case would lie in the Seventh Circuit, we are bound to follow the rule of that circuit under *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Finally, it argues that *Wilson* endorses a finding that the standard of proof in this case should be only the preponderance of the evidence, not the strong proof standard.

We think that Specialized has misconstrued *Wilson Athletic G. Mfg. Co. v. Commissioner, supra.* In that case the petitioner, Wilson Athletic Goods Manufacturing Co., purchased the entire interest in a partnership, Wisconsin Shoe Co., from its two partners. Prior to the purchase, the petitioner bought athletic shoes from various manufacturers and sold them under the "Wilson" label. The purchase price was $570,000, which included $270,000 for current assets, $157,307.70 for fixed assets, and an additional $142,692.30 not specifically allocated. The petitioner argued that all but $10,000 of this additional amount was allocable to a covenant not to compete in the contract. Respondent contended that all $142,692.30 was allocable to goodwill. The Court of Appeals, reversing the Tax Court,[8] held that the petitioner's allocation was appropriate. In arriving at their decision, the Seventh Circuit concerned itself with the intent of the parties at the time the contract was entered into. It stated "it was the duty of the tax court and is our duty here to ascertain the true intent, insofar as tax consequences are concerned." (222 F.2d at 357.)

The court noted the following factors in support of its conclusions: The petitioner had its own means of distribution,

---

[7]We note that the Majors merely must prove their case by a preponderance of the evidence since they do not assert that the allocation is other than that expressed in the contract— zero. For these petitioners the strong proof standard is not applicable. Also, as a practical matter to the extent Specialized fails to meet its burden, the respondent conceded that the Majors should prevail.

[8]The Tax Court ruled that the covenant not to compete could not be severed from the goodwill of the partnership. The Seventh Circuit rejected the severability theory. This theory has now fallen into disfavor and is not generally applied to covenants not to compete in this and most other courts. See *Rich Hill Insurance Agency, Inc. v. Commissioner,* 58 T.C. 610, 617 n. 3.

customer lists, brand names, and more customers than it could supply, thus, it did not acquire Wisconsin Shoe Co. with the intent to obtain any of the above; the partners in Wisconsin Shoe Co. testified that they did not seriously plan on retiring; and petitioner desired only the factory and machinery. From these facts, the court concluded that the goodwill of Wisconsin Shoe Co. was not a bargained for element of the contract of sale, but the covenant not to compete was.

In *Wilson*, the Seventh Circuit did not address the issue of whether a standard stricter than mere preponderance of the evidence should or should not apply. It appears, however, that under the facts of *Wilson*, the petitioner would have met either standard. "We conclude that the record justifies *only* a finding that the value of the covenant not to compete was the sum of $132,692.30." (222 F.2d at 357; emphasis added.) Since *Wilson*, the Seventh Circuit has not addressed the issue of an allocation to a covenant not to compete. In light of the preference in this Court to apply the strong proof standard as applied to the intention of the parties, we shall proceed on the basis that this is acceptable to the Seventh Circuit. See *G C Services Corp. v. Commissioner*, 73 T.C. 406, 412 (1979); *Lucas v. Commissioner*, 58 T.C. 1022, 1032–1033 (1972); *Rich Hill Insurance Agency, Inc. v. Commissioner*, 58 T.C. 610, 617 (1972). Cf. *Lazisky v. Commissioner*, 72 T.C. 492, 501 (1979).[9]

Thus, in the instant case the petitioner, Specialized, must prove by strong proof that the parties intended an allocation to a separately bargained for covenant not to compete *and* that such an allocation comports with economic reality. Notwithstanding the application of the strong proof standard to the instant case, we are satisfied that regardless of the standard applied Specialized has failed to carry its burden.

---

[9]Specialized notes that in *Lazisky* this Court stated that the Seventh Circuit applied purely substance over form reasoning, citing *Wilson Athletic G. Mfg. Co. v. Commissioner*, 222 F.2d 355 (7th Cir. 1955). We do not consider this determinative, since Wilson was decided several years before the touchstone case dealing with the strong proof standard. *Ullman v. Commissioner*, 264 F.2d 305 (2d Cir. 1959).

Furthermore, it should be noted that *Wilson* has been relied on in this Court and the Ninth Circuit in cases applying the strong proof standard, for the proposition that intent of the parties is crucial. See *Annabelle Candy Co. v. Commissioner*, 314 F.2d 1, 6–7 (9th Cir. 1962); *Lucas v. Commissioner*, 58 T.C. 1022, 1033 (1972). Thus, it would appear that the Seventh Circuit's view toward intent of the parties and economic reality are not at all inconsistent with the strong proof standard.

In the first place we note that the fact that the agreement between the parties contains no specific allocation of the purchase price to the covenant is good evidence that none was intended. *Annabelle Candy Co. v. Commissioner*, 314 F.2d 1 (9th Cir. 1962); *Rich Hill Insurance Agency, Inc. v. Commissioner*, 58 T.C. 610 (1972). Specialized argues that it is entitled to, over 5 years, $400,000 in amortization of the covenant. We find it hard to believe that it intended such a significant allocation at the time the contract was entered into, yet did not express it despite the fact that there had been two preliminary drafts of the contract. Furthermore, during negotiations, the parties agreed to the purchase price for the Thunderbird stock prior to any mention of a covenant not to compete. The parties stipulated that at no time prior to the execution of the contract did they discuss any allocation to the covenant. Todd testified that he had read the contract before he signed it and that if he had desired any changes in it, he would have requested them. He also testified that he wanted only the operating authorities owned by Thunderbird, which, at that time, were extremely difficult to obtain directly from the I.C.C., and that he was not concerned about the present customers of Thunderbird since he felt he could obtain other customers. Todd made the decision to allocate only after his C.P.A. informed him of the tax consequences. He immediately wanted to allocate $500,000 to the covenant, but his accountant suggested $250,000 would be all to which the Majors might agree. Although Specialized's accountants suggested an allocation to the Majors' accountant in late 1972, which was rejected, Specialized never in fact informed the Majors that it had in fact made an allocation for tax purposes. It would appear that Specialized didn't want the Majors to know of their action. Additionally, 6-percent interest was charged on the entire balance due the Majors in accordance with the installment sale contract. Even the attorney for Specialized testified that of the many covenants not to compete he had written and seen, never had he seen interest charged on one. Clearly, these factors taken together make it perfectly clear that Specialized did not intend an allocation to the covenant not to compete at the time it purchased Thunderbird.

It is equally clear that the Majors intended no such allocation. In addition to several of the points raised above, the Majors were advised of the income tax effects of the sale prior to the

transaction. This advice assured them that the entire proceeds would be capital gain. Furthermore, the Majors agreed to the covenant without hesitation and without consideration since they had no intention to compete with Specialized. Thus, we find that the parties in no way intended any allocation to the covenant not to compete.

Finally, we must consider whether, notwithstanding the absence of intent to allocate a portion of the purchase price to the covenant not to compete, Specialized has met its burden to prove that, under the facts of this case, no other finding but that the covenant had some substantial discernible value is supported.[10] Once again, we find that Specialized has failed to meet its burden.

As noted above, Specialized was primarily interested in Thunderbird's operating authority. Todd testified that he was not interested in its customers because he felt he could get others—customers who, apparently, the Majors were either unwilling or unable to obtain. This is clearly indicative that, at the time of purchase, Todd, although he desired the covenant, was not seriously concerned about competition by the Majors. Furthermore, Hugh Major, who primarily ran Thunderbird, was 66 years of age and in failing health with diabetes and vision problems at the time the contract was entered into. These facts were then known to Todd. It is true, as Specialized argues, that even without operating authority the Majors could have acted as agents for other firms, especially since they had a good reputation in the trucking industry. Notwithstanding, Specialized has not met its burden to prove that at the time the contract was executed, the Majors were viewed as a realistic competitive threat. We do not suggest that the covenant had no value, but merely that evidence shows that at the time of contracting, the covenant possessed no more than an unascertainable de minimis value. Therefore, we hold that the Majors properly reported their entire gain on the sale of Thunderbird as a capital gain and

---

[10]We note that at least one Circuit Court—the First— would not entertain this issue unless raised by the Commissioner. See *Harvey Radio Laboratories, Inc. v. Commissioner*, 470 F.2d 118 (1st Cir. 1972). For the reasons stated in that case, we find such a rule quite appealing; however, a blanket rule which does not allow consideration by the court of economic reality in the outrageous case is far too strict. See *Wilson Athletic G. Mfg. Co. v. Commissioner*, 222 F.2d 355 (7th Cir. 1955); see also *Lazisky v. Commissioner*, 72 T.C. 495 (1979).

that Specialized is not entitled to allocate any portion of the purchase price of Thunderbird to the covenant not to compete.

*Decision will be entered under Rule 155 in docket No. 9780–75.*

*Decision will be entered for the respondent in docket No. 9945–75.*