JAMES A. PATTERSON AND DOROTHY A. PATTERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Patterson v. Commissioner
Docket No. 25228-81.
United States Tax Court
T.C. Memo 1985-53; 1985 Tax Ct. Memo LEXIS 579; 49 T.C.M. (CCH) 670; T.C.M. (RIA) 85053; February 4, 1985
L. L. Leatherman and Hiram Ely III, for the petitioners. Robert Touchton, for the respondent. KORNER
*670 MEMORANDUM FINDINGS OF FACT AND OPINION "KORNER, Judge: Respondent determined a deficiency of income tax against petitioners in the amount of $599,352, relative to their raxable year ended December 31, 1975. By amended *580 answer filed on June 25, 1984, respondent soiught an additional deficiency of $530,002. After concessions, the sole issue remaining for decision is whether any part of the consideration received by petitioner James A. Patterson under an agreement for *2 the acquisition of his interest in Long John Silver's, Inc., is allocable to a covenant not to compete and taxable as ordinary income under section 61(a)(1). [1]
FINDINGS OF FACT Some of the facts have been stipulated, and are found accordingly. The stipulation and the exhibits attached thereto are incorporated herein by this reference. James A. Patterson (hereinafter "petitioner") and his wife, Dorothy A. Patterson [2] (hereinafter referred to, collectively, as "petitioners") were resident of Louisville, Kentucky at the time they filed their petition in this matter. For calendar year 1975, petitioners filed their joint Federal income tax return with the Internal Revenue Service Center in *581 Memphis, Tennessee. At the date of the trial, petitioner was 51 years old. At all times here pertinent, Jerrico, Inc. (hereinafter "Jerrico") was a Kentucky corporation headquartered in Lexington, Kentucky, and was the owner of a chain of coffee shops, known as Jerry's Restaurants. Warren Rosenthal was the president of *3 Jerrico and was also one of its shareholders, owning approximately 28.8 percent of its stock. Petitioner, who has a degree in marketing from the University of Louisville, has been in the food business since he was 26 years old. Prior to the inception of Long John Silver's, Inc. (hereinafter "LJS"), petitioner was a franchisee of Jerry's Restaurants for about ten years. Impressed with a fast-food business he had observed in Houston, Texas, which specialized in seafood, petitioner talked to representatives of Jerrico, and it was determined that they would together develop a new chain of fast-seafood restaurants. In or about August of 1969, LJS was formed as a subsidiary of Jerrico, and opened its first restaurant.
*582 LJS was capitalized with 2,000 shares of common capital stock, of which petitioner purchased 800 shares and Jerrico purchased the remainder. Thereafter, and until July of 1975, Jerrico and petitioner continuously owned 60 percent and 40 percent, respectively, of LJS's common stock, which was the only class of its stock issued and outstanding. At all times here pertinent, LJS was a Delaware corporation which was headquartered in Lexington, Kentucky. LJS was faced with a competitive market, and it experienced a slow rate of growth initially. By the early 1970's, however, LJS had developed into a fast growing and highly profitable enterprise. Thus, by the end of its June 30, 1975 fiscal year, *4 LJS had 373 restaurants in operation, and by October 10, 1975, it had 434 restaurants in operation and 88 more under construction. This explosive growth prompted a great deal of interest in Jerrico within the investment community. At the same time, the investment community was concerned about the substantial minority interest which petitioner held in LJS. Petitioner served as the president of LJS from 1969 through April 24, 1975, when he was terminated by Jerrico. Petitioner *583 was responsible for organizing and operating the corporation, for which he received an annual salary which reached the approximate amount of $60,000-$65,000. Petitioner also served as a director of Jerrico. During his early years with Jerrico, petitioner and Rosenthal were on good terms personally as well as professionally, but in or about mid-1974, their relationship began to deteriorate. This change stemmed, at least in part, from Rosenthal's displeasure over petitioner's direct communications with members of the investment community, a responsibility which Rosenthal thought to be within his exclusive province. Acting at the request of Rosenthal, in mid-1974, Alan McDowell, who had served as an investment banker for Jerrico, examined the possibility of a buy-out of petitioner's interest in LJS with shares of Jerrico. McDowell's conclusion, copies of which were transmitted to Warren Rosenthal and to petitioner, was *5 that petitioner should receive sufficient shares in Jerrico to provide him with a 30 percent interest in that company, or approximately 660,000 shares, an interest which would have been greater than Rosenthal's own interest in Jerrico at that time. Thinking *584 that this was unreasonable, Rosenthal rejected McDowell's recommendation. To accommodate the rapid expansion of LJS, in or about March of 1975, petitioner and Rosenthal traveled to New York City to visit several banks in an effort to secure a line of credit or a loan in the amount of between $9,000,000 and $15,000,000 for Jerrico. Chemical Bank of New York ultimately agreed to provide six to eight year financing for Jerrico, but as a precondition, it required petitioner to execute a dividend waiver agreement relative to his personally-held shares of LJS stock and to pledge such stock to guarantee the financing. While LJS had not theretofore issued any dividends, on advice of counsel, petitioner declined to sign the waiver and pledge because he believed that to do so would have rendered his stock worthless during the term of the loan, leaving his family without adequate resources in the event of his death. After petitioner refused to sign the waiver and pledge, Chemical Bank advised Jerrico that it would not provide financing as long as there was a 40 percent minority-interest shareholder in LJS. *6 On April 24, 1975, the directors of LJS removed petitioner as president *585 of that corporation. On May 15, 1975, petitioner resigned as a director of Jerrico. In May of 1975, negotiations began for the sale of petitioner's stock in LJS to Jerrico. Jerrico's interests during the negotiations were three-fold: First, to agree to a purchase price for the stock; second, to include a covenant not to compete; and third, to allocate a value to such covenant. Jerrico's primary reason for insisting on inclusion of the covenant was to protect the value of the interest in LJS which it was receiving from petitioner. Initially, Jerrico had in mind a total price of between $8,000,000 and $12,000,000, of which it expected that up to $3,000,000 would be for a covenant not to compete, and the remainder would be for petitioner's shares. The $3,000,000 figure for the noncompete covenant was derived by Rosenthal as an estimate of the damages Jerrico might sustain in the event that petitioner competed in the fast-seafood market after the sale of his interest in LJS. Since he had no interest in competing with his former associates or in going into the fast-seafood business again, petitioner did not object to executing the noncompete covenant, as long as it would allow *586 him to become involved in other types of restaurant enterprises, and he regarded such covenant as having no value. As stated by petitioner at trial: *7 Well, I didn't want to do that because [LJS] was my baby. I had conceived it, and given birth to it, and seen it rise to -- to what was then the top seafood chain in the country. There was nothing I wanted to do to -- to harm it * * *. As for the purchase price, in light of Alan McDowell's earlier estimates, petitioner believed that his stock in LJS was worth the fair market value at that time of 660,000 shares of Jerrico stock, or approximately $25,000,000-$30,000,000. During the meetings in May and June of 1975, petitioner was represented by members of an investment banking firm named Goldman Sachs and by A. Robert Doll, an attorney in Louisville, Kentucky; and Jerrico was represented by John P. Williams, Jr., an attorney in Cincinnati, Ohio, by David Weil, an attorney and officer of Jerrico, and by John Tobe, who was at that time a director and chief financial officer of Jerrico. For their services, petitioner paid Goldman Sachs and Doll the respective amounts of $288,000 and $100,000. Over the course of *587 the contract negotiations, Jerrico made numerous attempts to persuade petitioner to allocate a portion of the purchase price for his LJS stock to the covenant not to compete. On June 5 and June 6, 1975, when the most intensive negotiations were conducted, Jerrico offered to value the noncompete covenant, first at $3,000,000, then at $2,000,000, and finally at $1,000,000. Believing that he was being offered less than full value for his stock, however, petitioner would not make *8 a deal which included any allocation to the covenant, and he consistently and adamantly rejected all such proposals to assign any value to it. Jerrico's representatives never offered to allocate less than $1,000,000 to the noncompete covenant, because they were unwilling to agree that the covenant might be worth less than that amount. On June 5, 1975, Jerrico's board of directors met to consider, inter alia, the issue of the buy-out of petitioner's minority interest in LJS. At that meeting, the board resolved to authorize Jerrico's executive committee to negotiate a noncompete covenant and to determine the portion of the purchase consideration to be allocated thereto. At no time did Jerrico's board *588 bind its representatives to effectuate such an allocation. On June 6, 1975, an agreement in principle was reached between the parties, the terms of which were described in a news release which was signed by both parties on the same date. The news release provided, in pertinent part, as follows: [Rosenthal] today announced that an agreement in principle was reached by the Company and James A. Patterson * * *. The Company's intentions would be to purchase Mr. Patterson's [LJS] stock from the proceeds of a sale of stock in a public offering with 350,000 shares of the proceeds for the benefit of Mr. Patterson. Should the Company fail to have such a public offering by June 30, 1976, a cash purchase price would be made for $15,000,000. The price includes a three year covenant by Mr. Patterson to not compete. * * * [Emphasis added.] *9 During the remainder of June 1975, Jerrico's attorneys prepared a series of written drafts of the sales contract and covenant, which were then reviewed by petitioner's attorneys. Language which would have allocated a stated portion of the purchase price to the covenant, which appeared on an early draft of the covenant, was deleted *589 by petitioner's counsel, and never reappeared in any subsequent draft. In each draft of the contract, language was retained by both parties providing that petitioner agreed to enter into a noncompete covenant "as consideration for part of the purchase price" provided for in the contract. The sales contract and a covenant not to compete, which was incorporated within such contract as an exhibit, were executed by petitioner and Jerrico on July 1, 1975, providing that petitioner would receive the greater of $15,000,000 or the proceeds of the sale of 350,000 shares of Jerrico stock in exchange for his 40 percent interest in LJS, which consisted of 800 shares of stock in that company. Like the earlier drafts, the contract provided that "[a]s consideration for part of the purchase price * * * Patterson agrees, simultaneously with the execution of this Agreement, to enter into a Covenant Not To Compete in the form attached hereto as Exhibit F." The noncompete covenant is an eight-page document wherein "in consideration of the agreements made by Jerrico in the Agreement and * * * of the consummation of the acquisition of the *10 Selling Stockholder's Forty Percent (40%) stock *590 interest," petitioner agreed, in essence, not to engage in the seafood business or to induce anyone else to engage in such business for a period of three years, and not to induce or influence any employee of LJS or Jerrico to terminate such employment or to work for him for a period of one year. It was recited three times in succession in the "whereas" clauses of the covenant that it was being given "as an inducement to" or "in consideration of" the acquisition of petitioner's 40 percent interest in LJS. Jerrico's obligation to pay to petitioner the amounts indicated under the contract was in no manner conditioned upon petitioner's compliance with the terms of the noncompete covenant. Under the contract, if the proposed sale of 350,000 shares of Jerrico stock failed to occur in a timely manner, Jerrico was required to make an immediate payment of cash and notes totaling $15,000,000, and Jerrico was required to pay interest on such notes until they were paid in full. The contract provided that its benefits were to inure to the benefit of petitioner's "heirs, personal representatives, successors and assigns." In accordance with the terms of the foregoing contract, on or about *591 October 16, 1975, Jerrico paid petitioner the sum of $19,251,909, representing its proceeds from the sale of 350,000 shares of its common stock. *11 Neither the sales contract executed by both parties on July 1, 1975, nor the covenant not to compete itself, sets forth an allocation of any portion of the agreed purchase price to the covenant. Despite the absence of such an allocation in the contract, Jerrico subsequently attributed $1,000,000 of the purchase price to the covenant on its annual report, prospectus, and filings with the Securities and Exchange Commission. Jerrico actually believed that the covenant had a value in excess of this amount, but as described by its then-director and chief financial officer, John Tobe, it reported such amount for the following reason: The conservative side of it, again, came in to bear when you used $1 million because the exposure was too great for the company of that size to take on a nonstipulated dollar amount. It -- for usre had a noncompete agreement to it, as we are all aware; but it did not have a value. * * * It was felt that $1 million would be a minimal type value that no one would question, and that was the reason it *592 was used. Jerrico's prospectus for the sale of the shares of stock from which petitioner was paid, dated October 8, 1975, similarly attributed $1,000,000 to the covenant not to compete, and provided as follows: The material factors management considered in establishing the price that it was willing to pay for the 40% interest were its opinion as to the value and the future of LJS. * * * The purchase agreement, which includes a covenant not to compete for three years, provides for a purchase price of the greater of the *12 proceeds from the public sale of 350,000 of the Company's Common Shares * * * or $15 million. * * * [Emphasis added.] On their Federal income tax return for 1975, petitioners reported a capital gain of $18,847,909, from the sale of the 800 shares of stock in LJS, computed as follows: Gross sales price:
$18,863,909
Basis:
16,000
Capital gain:
$18,847,909
In arriving at the foregoing gross sales price, petitioner subtracted from the gorss proceeds of $19,251,909, the amounts which he had paid to Goldman Sachs and Doll for their services relative to the sale. On its Federal income tax return for 1975, Jerrico attributed *593 $1,000,000 of the sales price to the covenant not to compete. OPINION After concessions, we must determine solely whether any portion of the proceeds received by petitioner pursuant to his July 1, 1975 agreement with Jerrico, in the amount of $19,251,909, is allocable to his covenant not to compete. Respondent determined that $1,000,000 of such proceeds were allocable to the covenant. By amended answer filed on June 25, 1984, however, respondent increased to $3,000,000 his *13 determination of the portion of the proceeds which were so allocable. [3] As to respondent's initial determination, petitioners bear the burden of proof. [4] As acknowledge by respondent, however, it is he who bears such burden with respect to the additional amount he determined against petitioners by amended answer. [5] Rule 142(a). *594 Since compensation for refraining from the performance of services is clearly ordinary income, if any of the consideration received by petitioner for his stock in LJS is allocable to his *14 covenant not to compete, he is taxable on that amount as ordinary income under section 61(a)(1). On the other hand, if no part of such consideration is properly allocable to the covenant, the entire amount of petitioners' gain is taxable as capital gain under sections 1221 and 1222. In evaluating this issue, this Court favors a rule which places a heavy emphasis upon the intention of the parties to the contract at the time the contract is entered into. See Major v. Commissioner,76 T.C. 239, 246 (1981); Klitzner v. Commissioner,T.C. Memo. 1964-263, affd. per curiam 358 F.2d 678 (6th Cir. 1966), cert. denied 385 U.S. 928 (1966); Montesi v. Commissioner,40 T.C. 511 (1963), affd. 340 F.2d 97 (6th Cir. 1965). See also Theophelis v. United States,     F.2d     (6th Cir. 1984); Markham & Brown, Inc. v. United States,648 F.2d 1043 (5th Cir. 1981); Better Beverages, Inc. v. United States,619 F.2d 424, 430 (5th Cir. 1980), *595 rehearing denied 625 F.2d 1160 (5th Cir. 1980). The parties are in accord herein that the instant case turns on our resolution of this intent issue. As we have found, the sales contract executed by petitioner and Jerrico on July 1, 1975, fails to allocate any portion of the agreed purchase price to the noncompete covenant, constituting good evidence that none was intended. Major v. Commissioner,supra,76 T.C. at 250. However, according to respondent, the parties to the contract failed to allocate a portion of the purchase price to the covenant, not because they agreed that no *15 amount should be allocated, but because they could not agree on the amount to be allocated, and they therefore agreed to "allow a third party, the court, to determine the value to be allocated to the covenant." Respondent therefore invites us to examine the value of the covenant executed by petitioner so that we might make such an allocation. However, since we are convinced on this record that Jerrico acceded to petitioner's adamant and steadfast refusal to allocate any portion of the purchase price to the noncompete covenant, we decline to accept respondent's *596 invitation. This record discloses that the negotiations which led to execution of the sales contract and covenant were vigorous and protracted. Both parties were ably represented by knowledgeable negotiators and by counsel, who were seemingly well aware of the Federal tax implications of any allocation to the noncompete covenant. During the course of the negotiations, Jerrico repeatedly attempted to get petitioner to agree to an allocation of part of the purchase price to the noncompete covenant. Petitioner, whom we found to be a credible witness, described his response, as follows: * * * they submitted draft after draft, which we kept knocking out. I would not have made the deal had they put an allocation in there. It was a matter of principle to me. I was not getting what I thought my stock was worth; and for them to turn around and * * * do a fancy trick to deduct a certain amount of money, I was not going to be a party to [sic]. *16 Petitioner agreed to execute a noncompete covenant since he believed that it cost him nothing to do so. However, believing that he was being underpaid for his minority interest in LJS, and probably aware of the negative tax implications *597 of any allocation to the noncompete covenant, petitioner consistently refused any such allocation, including Jerrico's successive offers of $3,000,000, $2,000,000 and $1,000,000. [6] Petitioner testified that there would have been no deal which included an allocation. For its part, Jerrico opposed any allocation of less than $1,000,000 to the covenant. Under these circumstances, respondent's initial contention - that we should uphold an allocation *598 of $1,000,000 to the covenant - would require us to rewrite the subject agreement so as to impose upon petitioner a contractual term which was the object, as respondent concedes, of intense negotiations, but which petitioner unequivocally and consistently refused to accept. We decline to do this. A fortiori, we also decline respondent's contention, by amended answer, that we should now uphold an *17 allocation to petitioner's covenant not to compete with Jerrico, not only of $1,000,000, but also of an additional $2,000,000. When Jerrico's board considered the matter of an allocation to be covenant on June 6, 1975, it authorized its executive committee to allocate a portion of the purchase price to the covenant, but at no time required that such an allocation be provided for. Furthermore, it was the testimony of all of the witnesses who were participants in the contract negotiations during May and June of 1975, including Patterson, Doll, Tobe, Williams and Rosenthal, that no allocation to the covenant was ever agreed to. Significantly, Williams, Jerrico's counsel during the negotiations, testified for respondent that "[t]he other side * * * would not agree to *599 our stipulating or putting a value on the covenant," and "[t]here was never a reference to an amount because * * * on the sixth, when we reached the agreement, it was agreed by the parties that * * * they would not put a dollar amount against that covenant." [Emphasis added.] In several respects, the terms of the sales contract and covenant executed by petitioner and Jerrico on July 1, 1975, also support our conclusion that it was the purposeful agreement of the parties to allocate no portion of the purchase price to the covenant. First, the "whereas" clauses of the covenant provide in three separate paragraphs that the covenant was given in consideration of Jerrico's acquisition of petitioner's minority interest in LJS, suggesting that it was not in consideration of *18 the payment of any sum of money. Second, Jerrico's obligation to pay the agreed amount to petitioner was not conditioned in any manner upon petitioner's compliance with the noncompete covenant, suggesting that no portion of such amount was allocable to the covenant. [7] Third, the benefits of the contract, presumably including petitioner's entitlement to receive the full purchase price, were to *600 inure to the benefit of petitioner's heirs, personal representatives, successors and assigns, a provision which would seem to be inapposite to the extent that a portion of the purchase price was for petitioner's agreement not to compete with his former employer. [8] Fourth, the contract provided for Jerrico's payment of interest on any notes it might have been required to make in petitioner's favor in the event that the sale of Jerrico's stock failed to occur in a timely manner. It seems improbable that Jerrico would pay interest on an obligation if it was incurred for a continuing covenant. [9]
Lastly, we find it significant that Jerrico's prospectus for the October 1975 stock offering fails to list the noncompete covenant within its description of those "material factors" which were considered in fixing the purchase price stated in the contract. *19 Respondent relies heavily on the facts that the contract *601 for the sale of petitioner's shares in LJS recites that his agreement to enter into a noncompete covenant constituted "consideration for part of the purchase price," and that a similar provision was also included in the June 6, 1975 news release, by which the parties to the contract first announced an agreement in principle. Viewing the record as a whole, however, we are convinced by the testimony of John P. Williams, Jr. and A. Robert Doll, both of whom were involved in the contract negotiations, on opposing sides, that the quoted language was included in the belief that it would, as stated by Doll, "provide a valid legal consideration for the noncompetition covenant." Moreover, that the foregoing language is not dispositive is confirmed by our holding in Howard Construction, Inc. v. Commissioner,43 T.C. 343 (1964). In that case, we held that no portion of the amount paid by the purchaser for stock of the corporation it acquired was allocable to the noncompete covenant, where the sales contract provided, in pertinent part, that "As part of the consideration for the purchase of said stock, the said parties * * * covenant * * * that they will not participate in * *602 * * competition * * *." 43 T.C. at 351. See also Sigman v. Commissioner,T.C. Memo. 1972-256. We are mindful that our foregoing holding suggests that the covenant was given in exchange for some value. However, the evidence is clear that such agreed value was not $1,000,000 or *20 more, and, as noted by this Court in Major v. Commissioner,supra at 251, "We do not suggest that the covenant had no value, but merely that evidence shows that at the time of contracting, the covenant possessed no more than an unascertainable de minimis value." [10]
*603 In sum, we believe that this case, wherein Jerrico ultimately acceded to petitioner's steadfast opposition to any allocation to the noncompete covenant, is factually similar to a Memorandum Opinion of this Court, Sigman v. Commissioner,supra, and, like that case, is to be distinguished from a factual situation in which the parties cannot agree on the amount to be *21 allocated. See Kinney v. Commissioner,58 T.C. 1038 (1972). The following language from our opinion in Sigman is equally applicable to the instant case: We think this genuine agreement of the parties should be respected. It was hammered out through arms-length negotiations, and it reflects their true intent. It is not a collusive arrangement. To allocate part of the * * * price to the noncompete covenant in this proceeding would be tantamount to setting aside a bona fide contract and substituting a revised version which petitioner expressly rejected. Accordingly, we hold that petitioners properly reported their entire gain on the sale of petitioner's interest in LJS as capital gain and that no portion of the purchase price is allocable to the covenant not *604 to compete. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise stated.↩
2. Dorothy A. Patterson was joined in this matter solely because she filed a joint return with James A. Patterson for the year in issue.↩
3. As grounds for the increased deficiency, respondent's amended answer provides, inter alia, as follows: (c) At the trial of this case, Jerrico, Inc. will testify that the value of the covenant is $3,000,000, not $1,000,000, as originally claimed by them. (d) Respondent is in a whipsaw position. If Jerrico, Inc. claims the value of the covenant is $3,000,000, respondent must take that position in this case to protect the revenue.↩
4. Contrary to petitioners' contention that respondent is trying to impute to the sales contract an allocation that is absent from the contract as written, and must therefore bear the burden of proving the determination in his statutory notice of deficiency, we have held that "in cases such as the one at bar, involving allocations to covenants not to compete, the respective petitioners each bear the burden of proving that respondent's determination as to them is erroneous," Peterson Machine Tool, Inc. v. Commissioner,79 T.C. 72, 81 (1982), affd.     F.2d     (10th Cir. 1984, 54 AFTR2d 84-5139, at 84-5408, 84-2 USTC par. 9885), and it is clear that this rule extends to the circumstances of the instant case. See Sigman v. Commissioner,T.C. Memo. 1972-256↩. 5. It will be unnecessary for us to determine whether respondent must be held to the so-called strong proof test in this case, as petitioners contend, since even if he were, our disposition of the instant issue would remain unchanged. See Major v. Commissioner,76 T.C. 239, 247↩ (1981).
6. Respondent would have us find that petitioner's representative at one point suggested that the product of petitioner's salary multiplied by three, or $180,000, might be allocated to the covenant. Since, on balance, we believe the testimony of petitioner's then counsel, A. Robert Doll - "[t]hey wanted to allocate, and I refused to allocate because he hadn't gotten paid for his stock in full * * *. And I just stone walled. I just said 'There is going to be no allocation'" - we have declined to make this finding. However, to the extent that the requested finding might be meritorious, it is clear from the testimony of Jerrico's then counsel, John P. Williams, Jr., that the proposal described therein was summarily rejected by Jerrico.↩
7. See Sigman v. Commissioner,supra.↩
8. Cf. Kenney v. Commissioner,37 T.C. 1161, 1173↩ (1962). 9. See Major v. Commissioner,supra at 250; Sigman v. Commissioner,supra.↩
10. Respondent also contends that to the extent that the so-called "severability test" might apply herein, it is not clear, as petitioners contend, that there would be no allocation to the instant covenant. This test examines whether the noncompete covenant can be severed from the transfer of goodwill or is merely a protective accompaniment to the transfer of goodwill. We believe that the covenant was bargained for, not separately, but as an essential component of the entire purchase arrangement. Moreover, the noncompete covenant itself recites that "this Covenant is intended to protect LJS interests and the interests of its franchise-owning employees in the assets owned by each of them * * *." It was the direct testimony of John Tobe, respondent's witness, that "the noncompete had to be there to give you protection against Mr. Patterson forming his own company and creating difficulty as far as the value you had paid for the asset of the minority interest. So, the deal would not have been structured without a noncompete agreement." On this record, we have found that Jerrico's primary reason for insisting on inclusion of the noncompete covenant was to protect the value of the interest in LJS which it was receiving from petitioner. Where the covenant serves primarily as a protective accompaniment to the transfer of goodwill, as in the instant case, the covenant is regarded as being nonseverable, and as being a contributing element of the assets transferred. Montesi v. Commissioner,40 T.C. 511, 518 (1963), affd. 340 F.2d 97 (6th Cir. 1965). See also Theophelis v. United States,↩     F.2d     (6th Cir. 1984).