ELLSWORTH GOLDSTEIN and HENRIETTA GOLDSTEIN, ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Goldstein v. Commissioner
Docket Nos. 3541-78, 14516-79, 14517-79
United States Tax Court
T.C. Memo 1984-62; 1984 Tax Ct. Memo LEXIS 611; 47 T.C.M. (CCH) 1041; T.C.M. (RIA) 84062; February 7, 1984. Lewis A. Freeman, Jr. for the petitioners in docket Number 3541-78. Leonard Jay Reade and L. William Fishman, *612 for the petitioners in docket Numbers 14516-79 and 14517-79. Michael A. DeLuca, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: In these consolidated cases respondent has determined deficiencies in petitioners' Federal income taxes as follows: Petitioner
Year Ending
Deficiency
Ellsworth Goldstein and
Henrietta Goldstein
Dec. 31, 1973
$32,820
Amworth Industries Corp.
July 31, 1973
31,440
Eunice Wilson
Dec. 31, 1973
37,756
Concessions having been made, the issues remaining for decision are: (1) whether payments made by Amworth Industries Corp. to Henrietta Goldstein during 1973 were allocable to a covenant not to compete, and (2) whether certain payments made by Amworth Industries Corp. to Henrietta Goldstein during 1973 constitute a constructive dividend to petitioner Eunice Wilson. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Ellsworth and Henrietta Goldstein (hereinafter referred to as the Goldsteins), husband and wife, resided in Freeport, New York *613 at the time of the filing of the petition in this case. They timely filed their joint Federal income tax return for their 1973 taxable year. Petitioner Amworth Industries Corp. (Amworth), is a New York corporation with its principal place of business in West Palm Beach, Florida at the time of the filing of the petition herein. It timely filed its corporate Federal income tax return for its taxable year ending July 31, 1973. Petitioner Eunice Wilson (Wilson) resided in East Meadow, New York at the time the petition herein was filed.She timely filed a Federal income tax return for 1973. Prior to 1963, Wilson's late husband, Ami, was engaged in the business of importing glass products from various countries for distribution and sale throughout the United States. The business was conducted by Top Trading Corp., in which Ami owned 50 percent of the outstanding stock. Prior to 1963, Ellsworth Goldstein (Ellsworth) owned and operated Ellsworth Goldstein, Inc. which was engaged in the business of importing milled lumber products primarily from Mexico for distribution and sale throughout the United States. In 1963, Ami and Ellsworth combined their business activities. After *614 the formation of the joint venture, Ellsworth was primarily involved in conducting the lumber business but also assisted in managing the glass business. In 1968 or 1969, Ami and Ellsworth formed TTC Industries, Inc. (TTC) for the purpose of conducting both the glass and lumber business. At or about that time, approximately 30 percent of the stock of TTC was sold in a public offering and another corporation, Armstrong Glass Co., Inc. (Armstrong) was acquired in a stock-for-stock exchange. Following these transactions, 23-1/3 percent of TTC was owned by Ami, 23-1/3 percent by Ellsworth, 23-1/3 percent by former Armstrong shareholders, and 30 percent was owned by the general public. In 1970, Ami and Ellsworth sold their stock in TTC to American Diversified Industries, Inc. (ADI) in exchange for stock in ADI. Subsequently, both TTC and Armstrong were declared bankrupt. On December 7, 1970, Amworth was organized under the laws of the State of New York. Between the date of incorporation and April 28, 1972, Amworth engaged in the same glass importing and lumber importing activities previously conducted by TTC. After Amworth's incorporation and at all times prior to the sale *615 by Henrietta Goldstein (Goldstein) of her Amworth stock, Amworth was owned 50 percent by Eunice Wilson and 50 percent by Henrietta Goldstein. Although Ami and Ellsworth did not acquire any equity interest in Amworth upon its incorporation, they were actively engaged in the conduct of its business. Amworth's business consisted of two major divisions. One division imported glass products from Hungary, Korea and India for distribution and sale throughout the United States. The other division imported lumber and mill products from Mexico for distribution and sale throughout the United States. During the 1960's, the primary source of glass products for Top Trading Corp. and TTC was a company in Poland by the name of Minex. During the 1970's, the primary source of glass products for Amworth was a Hungarian company by the name of Ferunion. From 1963 through 1970, the glass importing business generally experienced more sales and displayed greater profit potential than the lumber importing business. Eunice Wilson and Henrietta Goldstein each owned a 50 percent interest in El Am Realty Corp. Shortly after Ami's death in December 1971, there followed major disputes between the *616 Wilsons (Eunice and her two sons) and the Goldsteins regarding the conduct of Amworth's business affairs. On the evening of April 6, 1972, an Amworth stockholders' meeting was held in which negotiations for the separation of the business were conducted. At that meeting, Jacob M. Shapiro, Esq. represented the Goldstein interest and Leonard Siegel, Esq. and Ivan Ezrine, Esq. represented the Wilson interest. H. William Silfen (Silfen), the president of Amworth sat outside the room where the attorneys were negotiating. At one point during the negotiations he was called into the room to provide his estimated value of Goldstein's stock in Amworth. On April 7, 1972, Wilson and Goldstein executed a Memorandum of Understanding regarding the separation of the business activities of Amworth into two corporations. One corporation (to keep the name Amworth) was to operate the glass importing business and be owned by Wilson and the other (to be placed under a new corporate name) was to operate the lumber importing business and to be owned by Goldstein. Paragraph 2 of the Memorandum of Understanding, dated April 7, 1972 provide in part: Purchase of Amworth stock from Goldstein by *617 Wilson:
Wilson (or her designee) shall, purchase the 200,000 shares of Amworth owned of record by Goldstein for the sum of ($50,000, payable by certified check or good funds at the closing hereunder), and the additional, contingent sum of 6% of annual gross profit for a five year period commencing upon the closing hereof (limited to a maximum of $25,000 during each of such five years). * * * Under the section entitled Miscellaneous items, the memorandum provided in part: 6) The lumber business now being conducted by Amworth will become the property of Goldstein. Such business will be transferred to a new corporation, the shares of capital stock of which will be placed in escrow to insure compliance with the Goldsteins' * * * restrictive covenant not to compete with Amworth. The Memorandum of Understanding also stated that its implementation "is subject to the drafting and execution of definitive legal agreements." A formal agreement between the Goldsteins, the Wilsons, Amworth, and El Am Realty Corp. was executed by those parties on April 28, 1972 (hereinafter sometimes referred to as "the agreement"). Pursuant to the April 28, 1972 agreement, Goldstein sold her entire *618 stock interest (200,000 shares) in Amworth to Wilson; Amworth agreed to discontinue its lumber business in favor of Goldstein; the Goldsteins agreed to certain restrictions against competing for a 5-year period with Amworth's glass business; and Amworth and the Wilsons agreed to certain restrictions against competing with the Goldsteins' lumber business for a 5-year period. The agreement provided in pertinent part: WHEREAS, GOLDSTEIN and WILSON are the sole shareholders of all of the outstanding and issued stock of AMWORTH and EL AM, each owning 200,000 shares of AMWORTH and 5 shares of EL AM respectively, and WHEREAS, AMWORTH is in the process of making a public offering of additional shares of its common stock, and WHEREAS, GOLDSTEIN and WILSON are deadlocked with regard to the conduct of the business and affairs of AMWORTH and WHEREAS, GOLDSTEIN and WILSON are desirous of settling their differences by the sale and transfer of the shares of AMWORTH stock by GOLDSTEIN to WILSON and in the shares of EL AM stock by WILSON to GOLDSTEIN. NOW THEREFORE, in consideration of the premises and the mutual covenants herein contained, the sufficiency of which is hereby acknowledged *619 by all parties hereto, it is agreed as follows: 1. GOLDSTEIN hereby agrees to sell and WILSON hereby agrees to buy the entire 200,000 shares of AMWORTH INDUSTRIES CORP., presently owned by GOLDSTEIN, at the price and on the terms and conditions herein set forth. 2. The purchase price to be paid by WILSON to GOLDSTEIN for said 200,000 shares of AMWORTH shall be the sum of FIFTY THOUSAND ($50,000.00) DOLLARS to be paid by Certified or Cashier's Check, at the time of the signing of this Agreement, receipt of which is hereby acknowledged. 3. In addition to the foregoing consideration, WILSON will transfer and assign to GOLDSTEIN all of WILSON'S RIGHT, title and interest in and to the 5 shares of outstanding stock held in WILSON'S name in EL AM REALTY CORP. to GOLDSTEIN, together with any right, title and interest that WILSON may have to any assets or property held by EL AM.
4. GOLDSTEIN hereby transfers and assigns to WILSON (A) the indebtedness due to GOLDSTEIN BY AMWORTH of the sum of TWENTY ONE THOUSAND ($21,000.00) DOLLARS, [heretofore] loaned by GOLDSTEIN to AMWORTH with full authority in WILSON to cancel said indebtedness and release AMWORTH from any and all obligations *620 owed by AMWORTH to GOLDSTEIN, except as hereinafter set forth, (B) the total equity investment of GOLDSTEIN in AMWORTH. 5. As additional consideration for the sale and transfer of the aforesaid shares of AMWORTH, THE extinguishment of the aforesaid debt of TWENTY ONE THOUSAND ($21,000.00) DOLLARS and the restrictive covenants hereinafter set forth, AMWORTH and WILSON agree to pay to GOLDSTEIN the sum of six percentum (6%) of the annual Gross Profit of AMWORTH for a period of 5 years from the date of closing hereof. Such payment shall be limited to and not exceed the sum of TWENTY FIVE THOUSAND ($25,000.00) DOLLARS per annum. * * * * * * 13. The business presently conducted by AMWORTH consists of 2 major divisions. One division consists of the importation of glass products from Hungary, Korea and India for distribution and sale throughout the United States. The other division involves the importation of lumber and mill products from Mexico for distribution and sale throughout the United States. The parties hereto agree that the aforesaid business divisions shall be separated and the glass divisions shall remain with WILSON and AMWORTH and the lumber division shall be carried *621 on by GOLDSTEIN. AMWORTH shall retain and continue to engage in the glass business especially with reference to the importation of manufactured glass from Hungary, Korea and India, now and in the future. AMWORTH will also presently continue in the Lumber business for the sole purpose of winding up the present accounts receivable and accounts payable on lumber business transacted up to the date of the closing herein and thereafter the entire lumber division shall belong to and be continued by GOLDSTEIN. 14. GOLDSTEIN and her husband ELLSWORTH GOLDSTEIN hereby covenant and agree to and with AMWORTH and WILSON that they will not reestablish, reopen, be engaged in, nor in any manner whatsoever become interested, directly or indirectly, either as employee, as owner, as partner, as agent, or as a stockholder, director or officer of a corporation, or otherwise, in any business trade or occupation similar to and competitive to the importation, sale and distribution of glass manufactured in the countries of Hungary, Korea and India * * *. This restrictive covenant shall continue for a period of 5 years from the date of the closing thereof and shall survive the said closing, provided *622 that AMWORTH and GOLDSTEIN ARE Not in default under any provisions of this Agreement and so long as AMWORTH pays to GOLDSTEIN the aforesaid 6% of the Annual Gross Profit of AMWORTH during each of the 5 years following the closing date of this Agreement with the limitations as hereinabove set forth. A breach by AMWORTH or WILSON, or the children of WILSON, who are signatories of this Agreement shall release GOLDSTEIN and her husband ELLSWORTH GOLDSTEIN from the terms and provisions of this restrictive covenant. This restrictive covenant shall apply only to the presently existing customer lists of AMWORTH and shall involve only the sale and distribution of glass manufactured and imported from Hungary, Korea and India only * * *. * * * AMWORTH with the full knowledge and consent of WILSON, at the time of the closing herein, will sell, transfer and assign to GOLDSTEIN the entire lumber business conducted by AMWORTH subsequent to the date of closing herein with the exception of the aforementioned accounts payable and accounts receivable. GOLDSTEIN shall form a new corporation for the purpose of taking over the aforementioned lumber business. The shares of stock to be issued to GOLDSTEIN *623 in this new lumber corporation shall be subscribed and transferred in blank and shall be delivered to JACOB M. SHAPIRO, ESQ. as the attorney for GOLDSTEIN to be held in escrow for the entire 5 year period during which the restrictive covenants affecting GOLDSTEIN and her husband ELLSWORTH GOLDSTEIN, shall be effective with respect to the aforementioned glass business. Upon the termination of the restrictive covenant said escrowee shall deliver the shares of capital stock of the newly formed lumber corporation to GOLDSTEIN. In the event of a default on the part of GOLDSTEIN and her husband ELLSWORTH GOLDSTEIN, with regard to the provisions set forth in the above mentioned restrictive covenant pertaining to the glass business, then the aforesaid capital stock of the lumber corporation may be sold at public or private sale by the escrowee and the proceeds of such sale shall be applied to the payment of all costs sustained by the escrowee and then to the satisfaction of any claim for damages of behalf of AMWORTH. Before there can be any public or private sale of the aforesaid escrow stock of the lumber corporation, notice of any default or breach of the restrictive covenants pertaining *624 to the glass business shall be given by AMWORTH to the escrowee and to GOLDSTEIN and in the event that such default is not forthwith cured, any question concerning such default shall be immediately submitted to the American Arbitration Association for arbitration pursuant to the rules and regulations of the said association, who shall also be empowered to determine the amount of damages, if any, due to AMWORTH. Any award made upon such arbitration shall be final and binding upon all the parties hereto and the cost of such arbitration shall be shared equally between the parties AMWORTH and GOLDSTEIN. The arbitration award shall be the final determination as to whether the escrow shares of stock of the lumber corporation are to be sold at public or private sale and shall determine how the proceeds of such sale shall be distributed. * * * 16. The officers and directors of AMWORTH, WILSON, and her sons JOEL WILSON and ZACH WILSON, hereby covenant and agree to and with GOLDSTEIN and the lumber corporation which she will form to conduct the aforesaid lumber business, that each of them will not reestablish, reopen, engage in, nor in any manner whatsoever become interested, directly *625 or indirectly, either as employee, as owner, as partner, as agrent, or as stockholder, director or officer of a corporation, or otherwise, in any business, trade or occupation similar to the aforesaid lumber business hereby transferred to GOLDSTEIN and the hewly formed lumber corporation throughout the United States for a period of 5 years from the date of closing herein. The parties subsequently amended paragraph 5 of the agreement to provide that Amworth shall make a minimum payment of $10,000 each year over the five-year period. On or about April 28, 1972, Wilson paid Goldstein $50,000. On February 24, 1972, Amworth entered into a contract with Ferunion, a Hungarian glass manufacturer, whereby Amworth was granted an exclusive distributorship of Ferunion glass in the United States. The contract was to expire in December 1977. Prior to 1972, Amworth had also obtained another valuable supply contract with Dongsung, a Korean glass manufacturer. By agreement dated February 8, 1972, the supply contract was extended until October 30, 1975. Prior to December 1971, Wilson had no involvement with the glass importing business and no relationship with Ferunion. Both Ami and Ellsworth, *626 however, had established personal contacts with representatives of Ferunion. However, after the death of Ami in December 1971, Wilson began to actively participate in the day-to-day affairs of Amworth's business. At the time the April 28, 1972 agreement was negotiated and executed, both Wilson and Silfen were concerned about the possibility of Ellsworth using his personal contacts with Ferunion to compete with Amworth in the glass business. Wilson and Silfen would not have entered into the agreement without the covenant by Ellsworth not to compete with Amworth's glass business. Neither Wilson nor Silfen were actively involved in the begotiations surrounding the April 28, 1972 agreement. The principal negotiations were between Jacob Shapiro, the Goldsteins' attorney, and Ivan Ezrine, the attorney for Wilson and Amworth. Both Shapiro and Ezrine prepared the actual agreement. The Goldsteins' son, Norman, was engaged in the importatation of glass with both Top Trading, Inc. and TTC and was still engaged in the importation of glass and sale in the United States at the time of trial. During the negotiations, the Wilsons requested that Norman be a party to the agreement but Norman *627 refused to sign. The agreement was nonetheless accepted without Norman's signature. While the Goldsteins' covenant not to compete was important to the Wilsons and Amworth, the parties to the agreement as well as their attorneys never attempted during the negotiations to allocate a specific value to such covenant. As of April 30, 1972, Amworth' total stockholders' equity as per its balance sheet was $37,511.32. In addition, its balance sheet indicates a loans payable to stockholders' figure of $41,522.10, part of which evidently included a $21,000 indebtedness due to Goldstein by Amworth which was transferred to Wilson pursuant to paragraph 5 of the agreement. For the period beginning on January 1, 1971 and ending April 30, 1972, Amworth's net profit after taxes was $34,124.99. Its net profit after taxes for the month of April 1972 was $23,989.47. Amworth's taxable income for its taxable year ending July 31, 1973 was $73,384 after taking a deduction of $60,750 for the restrictive covenant and after deducting salaries of $53,300 each for Eunice Wilson and Joel Wilson. By letter dated November 1, 1972, Ferunion informed Amworth that Ellsworth visited with Ferunion in Hungary *628 in June 1972 and discussed the possibility of having his son Norman import and sell Ferunion glass in the United States. Ferunion also stated that Norman had visited them to discuss this possibility and, in fact, had offered them a better deal. In concluding, Ferunion stated that "[w]e would like to draw your attention to the fact that during your next visit in Hungary, we must seriously discuss the question of price increase." After receipt of such letter, Amworth alleged that Ellsworth had breached the covenant not to compete contained in the agreement. In addition, by letter dated July 5, 1972, Goldstein alleged that Amworth had breached the agreement by failing to pay all the payables owed by Amworth to its prior lumber suppliers and that Amworth failed to provide the Goldsteins with monthly profit and loss statements. On January 5, 1973, Amworth, the Goldsteins, Wilson and an escrow agent entered into a settlement agreement in order to sever their relationship entirely and avoid the inevitable disputes that would occur throughout the 5-year contingent payout period. Under the settlement agreement, the parties agreed that Amworth would pay Goldstein a fixed sum of $73,000 *629 to replace the contingent payments that Amworth and Wilson were obligated to make to Goldstein. These amounts were to be paid by Amworth over a 150-day period so as to give Amworth additional time to pay this sum. The covenants entered into under the original agreement along with the other provisions of that agreement were to continue until the 150-day period expired. On its return for the taxable year ended July 31, 1973, Amworth deducted $60,750 for a "restrictive covenant" for payments made or accrued by it with regard to the January 5, 1973 settlement agreement. Respondent disallowed this deduction on the ground that the payments were not for a restrictive covenant, but were payments on behalf of Wilson for her purchase of Goldstein's stock interest in Amworth. Respondent further determined that Wilson received a constructive dividend from Amworth during 1973 in the amount of $73,938. [2]
*630 OPINION Issue 1. Covenant Not to Compete
This Court has once again been asked to determine what amount, if any, of a business sales price is properly allocable to a covenant not to compete. In order to protect the revenue, the respondent has sometimes taken inconsistent positions with respect to the tax consequences of the same transaction. See Major v. Commissioner,76 T.C. 239, 245-246 (1981). In the instant case, however, respondent has chosen to side with Goldstein (the seller) against both Wilson (the purchaser) and Amworth (the corporation who made the payments) while nominally reserving its rights against Goldstein should this Court decide in favor of Wilson and Amworth. See Baldarelli v. Commissioner,61 T.C. 44, 45 (1973). Amworth, a corporation engaged in the importation and domestic sale of glass and lumber products, was owned 50 percent by Wilson and 50 percent by Goldstein and operated by their respective spouses, Ami and Ellsworth. After Ami died, the Goldsteins and the Wilsons (Eunice and her two sons) agreed to split the business with the Goldsteins taking the lumber portion and the Wilsons taking the glass portion. *631 Since the glass business was more profitable than the lumber business, the parties agreed that the Wilsons should furnish additional consideration to the Goldsteins. On April 28, 1972, the parties executed a formal agreement for the division of the two businesses conducted by Amworth. Paragraphs one and two of the agreement state that Goldstein agrees to sell to Wilson her stock in Amworth for $50,000. Paragraph five of the agreement states in part that: As additional consideration for the sale and transfer of the aforesaid shares of AMWORTH, THE extinguishment of the aforesaid debt of TWENTY ONE THOUSAND ($21,000.00) DOLLARS, and the retrictive covenants hereinafter set forth, AMWORTH and WILSON agree to pay to GOLDSTEIN the sum of six percentum (6%) of the annual Gross Profit of AMWORTH for a period of 5 years from the date of closing hereof. * * * Paragraph 14 contains detailed provisions pursuant to which the Goldsteins covenanted not to compete with the glass business. Paragraph 16 includes a convenant by the Wilsons not to compete with the lumber business. After allegations by each side that the other was not complying with the terms of the agreement, the parties *632 executed a settlement agreement on January 5, 1973 whereby they agreed on a fixed sum of $73,000 to replace the contingent payments provided for in paragraph five of the agreement. Amworth made these payments in 1973 and deducted $60,750 of this amount on its tax return for the year ended July 31, 1973, as attributable to the covenant not to compete. Amworth takes the position that the entire contingent amounts set forth in paragraph 5 of the agreement were in consideration for the covenant and therefore all the payments made by Amworth in 1973 in discharge of its obligations under paragraph 5 are deductible under section 162. [3] In support of its position, they argue that the agreement was ambiguous and that the parties actually intended the entire contingent amount to be in exchange for the Goldsteins' covenant. Both respondent and the Goldsteins argue that no part of the sales price under the April 28, 1972 agreement represented payment for the covenant since the agreement contained no specific allocation thereto and the parties never intended any allocation. They *633 argue further that since the payments made by Amworth in 1973 under the settlement agreement were made to discharge the obligations of Amworth and Wilson under paragraph 5 of the April 28, 1972 agreement, the deductibility of the payments made by Amworth during 1973 depends on whether the agreement contained any specific allocation to the restrictive covenant. Since no specific sum was allocated thereto under the agreement and no allocation was discussed during the negotiations, they argue that Amworth's payments to Goldstein during 1973 were for the sale of the stock and not for the covenant. We agree with this rationale although for somewhat different reasons. The key inquiry herein is whether her parties intended to allocate a portion of the purchase price to te covenant not to compete at the time they signed the agreement. Annabelle Candy Co. v. Commissioner,314 F.2d 1, 8 (9th Cir. 1962), affg. a Memorandum Opinion of this Court. Baldarelli v. Commissioner,supra at 50-51. The intention of the parties is a factual issue to be determined in light *634 of all the evidence with primary emphasis on the written agreement. Levinson v. Commissioner,45 T.C. 380 (1966). The respective petitioners bear the burden of proving that the respondent's determination is erroneous. Major v. Commissioner,76 T.C. 239, 246 (1981). Several factors support our view that the parties did not intend to allocate a specific amount for the covenant not to compete. Under the agreement, no specific portion of the purchase price was allocated to the covenant not to compete. The lack of any specific allocation in the sales contract is evidence that no allocation was intended. Baldarelli v. Commissioner,supra at 51; see Annabelle Candy Co. v. Commissioner,supra at 7; Rich Hill Insurance Agency, Inc. v. Commissioner,58 T.C. 610, 618 (1972). A close reading of the agreement reveals that Goldstein was selling her stock in Amworth, cancelling a debt of $21,000 owed to her by Amworth, and covenanting not to compete with the glass business in exchange for a $50,000 cash *635 payment, a percentage of Amworth's gross profit for 5 years, Wilson's El Am stock, the lumber business to be operated through a new corporation, and a covenant by Amworth and Wilson not to compete with the lumber business. That the parties drew up the contract and set out the consideration flowing to and fro in hotchpot form demonstrates that they did not intend to allocate a specific sum to the Goldsteins' covenant not to compete. [4] Moreover, paragraph 11 of the agreement which specifically refers to the $50,000 payment by Wilson to Goldstein as the "initial installment of the purchase price" indicates that the contingent sums were intended to be further payments for Goldstein's stock in Amworth. *636 There were extensive negotiations surrounding the execution of the agreement, and the covenant was considered significant. However, there is nothing in the record to indicate that any separate valuation of the worth of the Goldsteins' covenant was either discussed or made. As the Ninth Circuit stated in Annabelle Candy Co.,supra at 8, "at the time the contract * * * was executed there was no expressed intention one way or the other as to allocation and tax consequences." It appears from the record that the principal negotiators were Jacob Shapiro, the Goldsteins' attorney, and Ivan Ezrine, the attorney for Wilson and Amworth. Shapiro testified that no specific sum was even discussed by the parties as consideration for the covenant.[5] There is conflicting testimony as to whether William Silfen, the president of Amworth, was actively involved in the negotiations surrounding the agreement. In any event, although Silfen testified as to his interpretation of the agreement and that the covenant had some economic reality (see Schulz v. Commissioner,294 F.2d 52 (9th Cir. 1961), affg. 34 T.C. 235 (1960)), we found his testimony unpersuasive of *637 any intent to allocate any amount to the covenant not to compete. In fact, his testimony indicates that he was more concerned that the agreement include the covenant rather than provide for a specific allocation of the purchase price to the covenant. Silfen also testified that he relied on Ivan Ezrine during the negotiations; unfortunately, we did not have the benefit of Ezrine's testimony. Wilson testified that she took no part in the negotiations. Thus, there is no evidence that in the negotiations surrounding the agreement the parties intended that specific portions of the purchase price should separately relate to the covenants. Cf. Rudie v. Commissioner,49 T.C. 131 (1967); Levinson v. Commissioner,45 T.C. 380 (1966). *638 On January 5, 1973, the parties executed a settlement agreement whereby they agreed that Amworth would pay Goldstein a fixed sum of $73,000 to replace the contingent payments provided for in paragraph five of the agreement. Neither the language of the settlement agreement nor the events preceding its execution indicate that the payout was in consideration for the Goldsteins' covenant. In fact, the evidence is to the contrary. The settlement agreement was entered into as a result of allegations by each party that the other was breaching the agreement. Thus, the settlement agreement, in providing for a payout of $73,000 over 150 days in lieu of contingent amounts over 5 years, hastened the severance of the parties' relationship. Under the settlement agreement, the covenant was to extend until the earlier of the date of the final payment or 150 days. It cannot be seriously contended that Amworth paid $73,000 for a covenant not to compete which lasted less than a year and which, in their view, was already breached. Additionally, since paragraph 14 of the agreement provided Amworth with a valuable remedy in the event the Goldsteins breached the covenant, it is inconceivable that *639 Amworth would pay Goldstein a large sum to keep the covenant in effect for only another five months rather than insist upon such remedy. [6]
In view of the foregoing, we believe that the parties, at the time they executed the contract of sale, did not intend to treat the covenant as a distinct item and consequently did not allocate any portion of the consideration thereto. And in any event, the covenants did not survive the settlement pursuant to which the payments in issue were made. Amworth insists however that this case should be governed by our decision in Kinney v. Commissioner,58 T.C. 1038 (1972) and that this Court should judicially allocate a portion of the purchase price to the covenant. in *640 Kinney we made such an allocation on the basis that the convenant had independent value although the agreement did not assign any specific value thereto. However, in Kinney we found that the failure to allocate was due to a disagreement between the parties, not because there was no discussion at all. 58 T.C. at 1043. In other words, both parties there intended that the covenant should have value but simply could not agree upon a precise allocation. Thus, Kinney is distinguishable since the facts herein do not show any intention by the parties as to allocation and we were not directed to any discussions by the parties with respect to the value of the covenant. Cf.,Better Beverages, Inc. v. United States,619 F.2d 424, 430, n. 7 (5th Cir. 1980). Additionally, we again note and emphasize that the covenant not to compete expired contemporaneous with and pursuant to the agreement under which the payments in issue were made. Accordingly, where there is no evidence that the parties discussed any specific allocation to the covenant or intended to *641 allocate a certain amount thereto, this Court will not restructure the deal for tax purposes and force upon them an agreement different from that they bargained for an consummated. As the Ninth Circuit stated in Annabelle Candy Co. v. Commissioner,supra at 7. It is true, as the Tax Court found, that the covenant not to compete played a very real part in the negotiation of a final contract between the parties, and was a valuable benefit to the petitioner. But if the parties did not intend that a part of the purchase price be allocated to this important and valuable covenant, that intention must be respected. Unless respected, the tax consequences which they contemplated as incident to the benefits and burdens of the contract would be disturbed. [7]
We thus conclude that the payments made by Amworth to Goldstein during 1973 pursuant to the settlement agreement are not deductible by Amworth and are taxable to the Goldsteins as long term capital gain. *642 Issue 2. Constructive Dividend to Wilson
The next issue for decision is whether payments made by Amworth to Goldstein pursuant to the settlement agreement constitute constructive dividends to petitioner Wilson. Respondent contends that the payments were made by Amworth on behalf of Wilson in discharge of the obligation under the agreement to pay for her purchase of Goldstein's stock in Amworth; consequently, they constitute constructive dividends to Wilson to the extent of Amworth's earnings and profits. Wilson contends, however, that since both Amworth and Wilson incurred the obligation under paragraph five of the agreement to make the contingent payments, Amworth made the payments under the settlement agreement in discharge of its own obligation.Thus, Wilson contends that she cannot be charged with a constructive dividend as a result of such payments. We disagree. Under section 61(a)(7) gross income includes the receipt of any dividend. A dividend is defined in section 316(a) as "any distribution of property made by a corporation to its shareholders." There is no requirement *643 that the dividend be formally declared or even intended by the corporation. Loftin and Woodard, Inc. v. United States,577 F.2d 1206, 1214 (5th Cir. 1978); Silverstein v. Commissioner,36 T.C. 438, 443 (1961). Accordingly, it is well established that a corporate payment of its shareholder's obligation or any payment for the shareholder's benefit may constitute a constructive dividend to that shareholder to the extent of available earnings and profits. Wall v. United States,164 F.2d 462 (4th Cir. 1947); see also Old Colony Trust Co. v. Commissioner,279 U.S. 716 (1929). We have recently held that the principle established in Wall v. United States,supra applies where a corporation discharges a joint obligation of the corporation and its shareholder. Yelencsics v. Commissioner,74 T.C. 1513 (1980). In Yelencsics we found that payments by a corporation to a former stockholder as partial consideration for the sale of the former stockholder's stock to the remaining stockholders constituted constructive dividends to the remaining stockholders. The fact that the corporation *644 was primarily liable to pay part of the stock purchase was not crucial since the corporation incurred the liability solely to benefit the shareholder and without any independent corporate purpose. 74 T.C. at 1530-1533. The same result must apply herein. We do not discern from the record any valid corporate purpose in incurring such liability. [8] In fact, the clear import of the agreement was that Wilson was purchasing Goldstein's stock on her own behalf and not as an agent for Amworth who jointly obligation itself to pay the purchase price. Consequently, although Amworth's payment discharged its own obligation under the agreement, the fact that that obligation was incurred to benefit Wilson and without any independent corporate purpose compels a decision for respondent on this issue. Yelencsics v. Commissioner,supra.[9]
*645 Decisions will be entered under Rule 155 in docket Nos. 3541-78 and 14517-79.
Decision will be entered for the respondent in docket No. 14516-79.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Amworth Industries Corp., docket No. 14516-79, and Eunice Wilson, docket No. 14517-79.↩
2. While the settlement agreement shows total consideration to be paid by Amworth to Goldstein of $73,000, respondent has determined that the total payments actually made by Amworth to Goldstein aggregated $73,938. The difference results from the $938 of interest income earned as of January 5, 1973 of the promissory note issued to Amworth by Triplay Ponderosa de Parral. Respondent now agrees, however, that $3,000 of the $73,938 paid by amworth was a proper business expense of Amworth and was not paid either for the stock of Amworth or for the restrictive covenant.↩
3. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
4. Indeed, the Memorandum of Understanding executed by Eunice Wilson and Henrietta Goldstein on April 7, 1972, which outlined the major points of the division of Amworth, supports our conclusion that the parties did not intend to allocate a part of the purchase price to the covenant. Paragraph 2 of that document states: Purchase of Amworth stock from Goldstein by Wilson: Wilson (or her designee) shall, purchase the 200,000 shares of Amworth owned of record by Goldstein for the sum of ($50,000, payable by certified check or good funds at the closing hereunder), and the additional, contingent sum of 6% of annual gross profit for a five year period commencing upon the closing hereof (limited to a maximum of $25,000 during each of such five years). * * * The restrictive covenant was mentioned under the paragraph dealing with "Miscellaneous Items", and no value was ascribed to such covenant.↩
5. In fact, both Jacob Shapiro and Ellsworth Goldstein testified that they considered the covenant given by Amworth and the Wilsons not to compete with the Goldsteins' lumber business to be quid pro quo for the Goldsteins' covenant. Although the evidence does indicate that the Goldsteins' covenant was valuable to Amworth, the Goldsteins did not show that Amworth and Wilson's covenant was equally as valuable. Nonetheless, as we discussed earlier, while the Goldsteins' covenant may have had some value, there was never a meeting of the minds between the Wilsons and the Goldsteins with respect to any intention to allocate any amounts of the purchase price to it.↩
6. Paragraph 14 of the agreement provided that in the event the Goldsteins breached the covenant, the "capital stock of the lumber corporation may be sold at public or provate sale by the escrowee and the proceeds of such sale shall be applied to the payment of all costs sustained by the escrowee and then to the satisfaction of any claim for damages on behalf of AMWORTH." This paragraph was one of the provisions carried over to the settlement agreement.↩
7. See also Better Beverages, Inc. v. United States,619 F.2d 424, 429-430 (5th Cir. 1980): Better Beverages, nonetheless, invites us to approach the transaction in terms of its "economic reality" and to determine an allocation for the covenant commensurate with its actual value, rather than adopting the IRS' zero basis. The only "economic reality" with which this court is concerned in the instant case, however, is the price that Better Beverags bargained and paid for the covenant and upon which a depreciation deduction may properly be predicated. A taxpayer's failure of proof on this point may not be overcome by abstract arguments, not tethered to the fact of the transaction, as to what might have been a fair and equitable price or apportionment. It is not the task of this or any court to restructure a taxpayer's dealings, in lieu of his facing a prescribed burden of proof, in order to justify his entitlement to some tax benefit. "[W]hen a taxpayer has failed to arrange his affairs so as to minimize his taxes, he cannot expect the court to do it for him nuncprotunc." Balthrope v. Commissioner,356 F.2d 28, 34↩ (5th Cir. 1966). [Fn. ref. omitted. Emphasis in original.]
8. Payments in consideration for the Goldsteins' covenant could constitute a valid corporate purpose and serve to benefit Amworth's own interests. However, we have previously rejected the contention that the amounts were in consideration for the covenant. Even assuming that the covenant had value and that part of the payments were for the covenant, Wilson has not offered any evidence relating to its value. See Rule 142(a), Tax Court Rules of Practice and Procedure.↩
9. Amworth's balance sheet and financial statement for the year ending July 31, 1973 along with its Federal income tax return for that year indicate that Amworth had sufficient earnings and profits to cover the distribution. While a corporation's earnings and profits, computed under sec. 312, are not necessarily equal to its retained earnings as shown on the corporate balance sheet, see Halpern v. Commissioner,T.C. Memo. 1982-31, Wilson has failed to adduce any evidence to show that Amworth did not have accumulated earnings and profits for years prior to 1973 together with available earnings and profits for 1973 sufficient to cover the amounts in question. Rule 142(a), Tax Court Rules of Practice and Procedure.↩