T.C. Memo. 1996-21


UNITED STATES TAX COURT


HERITAGE AUTO CENTER, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26362-92.                    Filed January 23, 1996.


Patricia Tucker, for petitioner.

Thomas F. Eagan, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARR, Judge:  Respondent determined deficiencies in petitioner's Federal income tax for 1988 and 1989 of $482 and $213,139, respectively.  By amended answer, respondent asserted increased deficiencies for 1988 and 1989 of $78,277 and $31,929, respectively.  Thus, the total deficiencies asserted by

respondent for 1988 and 1989 are $78,759 and $245,068, respectively.

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

After an agreement between the parties,[1] the issue for decision is whether petitioner is entitled to deductions for amortization of amounts paid to William Wright for a noncompetition and consulting agreement.  We hold that it is to the extent set out below.

## FINDINGS OF FACT

Some of the facts have been stipulated.  The stipulated facts and the accompanying exhibits are incorporated into our findings by this reference.  At the time of the filing of the petition, petitioner, Heritage Auto Center, Inc., maintained its principal place of business in Gladstone, Oregon.

During the years at issue, petitioner had four shareholders: E.W. Richardson, Bob Turner, Kenneth Blewett, and Wade Zellner (Mr. Richardson, Mr. Turner, Mr. Blewett, and Mr. Zellner).  At the date of trial, each one of these individuals had significant experience in the automobile dealership business.  Mr. Richardson had been in the automobile dealership business for approximately

---

[1]     We leave it to the parties to include their agreed adjustments in their Rule 155 computations.

27 years.  During this time, Mr. Richardson had owned and operated dealerships which sold both domestic and imported vehicles.  Mr. Turner had been in the automobile dealership business for approximately 30 years.  During this time, Mr. Turner had been involved in the ownership and operation of several dealerships, and he had several positions with Ford Motor Co.  Mr. Blewett had been in the automobile business for over 20 years.  Mr. Richardson, Mr. Turner, and Mr. Blewett, together, had acquired and operated dealerships in Albuquerque, New Mexico; Phoenix, Arizona; San Marcos, Texas; and San Antonio, Texas.  Mr. Zellner had been in the automobile business for more than 25 years, participating in almost every aspect of running an automobile dealership.

Prior to the years at issue, William T. Wright (Mr. Wright) solely owned two Washington corporations, W-T-W, Inc. and Totem Lake Suzuki, Inc., which operated two automobile dealerships in Kirkland, Washington.  The automobile dealerships did business under the names Totem Lake Ford-Toyota and Totem Lake Suzuki (sometimes Totem Lake dealerships).  Among other things, Mr. Wright had engaged in sales promotion and advertising for the Totem Lake dealerships, including the recording and broadcasting of local television commercials.

Prior to 1988, the Totem Lake dealerships and Mr. Wright had suffered adverse publicity in the metropolitan Seattle, Washington, area.  More specifically, in 1985, Mr. Wright,

individually, and W-T-W, Inc., were accused of consumer fraud by the attorney general of the State of Washington (attorney general).  On November 25, 1985, the attorney general, Mr. Wright, and W-T-W, Inc., executed a consent decree which was entered in the Superior Court for the State of Washington for King County.  Under the terms of the consent decree, Mr. Wright and W-T-W, Inc., were enjoined from participating in specific fraudulent activities relating to the advertising, sale, repair, or servicing of automobiles.  The lawsuit filed by the attorney general and the controversial advertising practices of W-T-W, Inc., were covered by the local press, with at least five articles appearing in the Seattle Times newspaper during the period from November 26, 1985, through January 8, 1986.

In addition to the lawsuit brought by the attorney general, Mr. Wright was also the subject of consumer lawsuits involving allegedly fraudulent sales practices; these suits were still pending in April of 1988.  Also in 1988, disgruntled customers picketed the Totem Lake dealerships, and a picture of one of these picketers and an article discussing the pickets appeared in the Seattle Times on April 20, 1988.  Furthermore, on April 15, 1988, seven former employees of W-T-W, Inc., filed a complaint against W-T-W, Inc., and Mr. Wright in the Superior Court of Washington for King County, alleging, among other things, the fraudulent endorsement of employee checks.

Before the foregoing adverse publicity, the Totem Lake dealerships had been very profitable. However, due to this adverse publicity, the dealerships sustained losses in 1986 and 1987.

In late January or early February of 1988, Mr. Richardson, Mr. Turner, and Mr. Blewett were in the market to acquire a dealership in San Antonio, Texas. While the group was in San Antonio, Texas, investigating a possible purchase, Mr. Turner received a call from Bobbie Koller (Ms. Koller), who was the Western Regional Manager of Ford Motor Co. Ms. Koller told Mr. Turner that the Totem Lake Ford-Toyota dealership was in severe financial trouble; furthermore, she wanted Mr. Richardson, Mr. Turner, and Mr. Blewett to consider purchasing the dealership.

Mr. Richardson, Mr. Turner, and Mr. Blewett flew directly from San Antonio, Texas, to Seattle, Washington, to examine the dealership. After arriving in Seattle, Washington, Mr. Richardson, Mr. Turner, and Mr. Blewett met directly with Mr. Wright to discuss the possible acquisition of the assets of the Totem Lake dealerships from Mr. Wright's corporations; they did not want to purchase Mr. Wright's corporations because of the potential liabilities against the corporations.

At the time of this first meeting, Mr. Wright was offering to sell the Totem Lake dealerships' assets for the same price he had negotiated with another potential buyer, Douglas Spedding (Mr. Spedding). Although Mr. Wright had apparently reached a

deal with Mr. Spedding, the deal fell through, because Ford Motor Co. had rejected Mr. Spedding as a potential franchisee. Mr. Richardson, Mr. Turner, and Mr. Blewett rejected Mr. Wright's initial offer.

After this first meeting, Mr. Richardson, Mr. Turner, and Mr. Blewett decided that they would return to their hometown, examine the financial statements of Mr. Wright's companies in more depth, and schedule another appointment with Mr. Wright. Mr. Richardson, Mr. Turner, and Mr. Blewett also had to decide who would run the Totem Lake dealerships if they did consummate a purchase from Mr. Wright. Before going back to continue negotiations with Mr. Wright, Mr. Richardson, Mr. Turner, and Mr. Blewett asked Mr. Zellner if he would be interested in running the Totem Lake dealerships. Mr. Zellner indicated that he was interested in running the dealerships.

At the end of February or the beginning of March 1988, but prior to March 4, 1988, Mr. Richardson, Mr. Turner, Mr. Blewett, and Mr. Zellner (sometimes the buyers), along with William Hyde, counsel for the buyers, went to Washington to negotiate with Mr. Wright. The negotiations were primarily between Mr. Wright and Mr. Richardson. The negotiations did not result in a purchase agreement, because the purchase price requested by Mr. Wright was too high for the buyers.

Before leaving Washington, Mr. Richardson and Mr. Blewett decided to make one more attempt to reach an agreement with Mr.

Wright.  They held a meeting.  At that meeting, and pursuant to a plan between Mr. Richardson and Mr. Blewett, Mr. Blewett stated to Mr. Wright that he would not participate in any deal in which the amount paid over the fair market value of the tangible assets was more than $1,250,000.  After Mr. Wright refused that offer, Mr. Blewett left the meeting.  Mr. Richardson and Mr. Wright continued negotiating.  About 30 minutes after Mr. Blewett left the meeting, Mr. Richardson emerged from the meeting stating that he had made a deal with Mr. Wright for $1,350,000 over the amount to be paid for tangible assets of the Totem Lake dealerships.

After reaching the aforementioned agreement, Mr. Wright and his counsel, Jerome Carpenter (Mr. Carpenter), met with the buyers, and their counsel, Mr. Hyde, to discuss the details of the agreement.  At this meeting, the details of the agreement between Mr. Richardson and Mr. Wright were made known to the others, and the attorneys were instructed to draft the appropriate agreements for signature.  Mr. Carpenter's notes from the meeting contain the entry "$1,350,000 Blue or Covenant Not to Compete".  The parties have stipulated that Mr. Carpenter was using the term "Blue" as a short hand expression for "goodwill".  Mr. Hyde's notes contain the notation "$1,350 K blue sky covenant and goodwill".

On March 4, 1988, the buyers entered into an agreement to purchase the enumerated assets of the two Washington corporations owned by Mr. Wright.  The agreement was titled "Purchase

Agreement and Escrow Instructions" (purchase agreement). The purchase agreement provided that "Buyer shall purchase all of Seller's goodwill as a going concern for the total price of Two Hundred Thousand Dollars ($200,000)", and that "Seller will preserve for Buyer the goodwill of the Dealerships, including the goodwill of its suppliers, customers and others having business relations with the Dealerships". The noncompetition agreement attached to the purchase agreement (noncompetition agreement) provided that $1,150,000 would be paid to Mr. Wright at closing for his agreement not to compete with the buyers for a period of 3 years. The agreement to allocate $200,000 to goodwill and $1,150,000 to the covenant not to compete was reached by Mr. Richardson and Mr. Wright; Mr. Turner, Mr. Blewett, Mr. Zellner, and Mr. Hyde all testified that they did not know the basis of these allocations, since none of them were involved in this part of the negotiations.

Shortly after the execution of the purchase agreement, Mr. Carpenter sent a letter, dated March 7, 1988, to Mr. Hyde. In regard to goodwill and the covenant not to compete, the letter read as follows:

> The parties will readjust the good will/covenant not to compete if it is determined that the manner of the allocation (i.e. $200,000 to good will and $1,150,000 to the covenant not to compete) is not in the best interest of Mr. Wright. I recognize, however, that, as far as this allocation is concerned, your client desires to have at least $100,000 applied to good will and does not desire to have a great deal more applied to good will.

Under a cover letter dated April 7, 1988, Mr. Carpenter sent Mr. Hyde a draft addendum to the purchase agreement; the draft addendum was titled "Noncompetition and Consulting Agreement" (draft noncompetition and consulting Agreement). The draft noncompetition and consulting agreement enclosed in Mr. Carpenter's April 7, 1988, letter to Mr. Hyde provided, in pertinent part, that: (1) The buyers would pay Mr. Wright $675,000 on the closing date as consideration for his covenant not to compete; (2) the buyers would employ Mr. Wright as a consultant for a period of 3 years, paying Mr. Wright $675,000 in cash, payable in three equal annual installments of $225,000; and (3) the buyers would also pay Mr. Wright a per diem fee of $1,000 per day for each and every day, or part thereof, that Mr. Wright expended any time consulting in any fashion with the buyers, whether such consultation was by telephone or in person.

Mr. Hyde went over Mr. Carpenter's letter and the accompanying draft noncompetition and consulting agreement, and he discussed the proposed agreement with the buyers. After his discussions with the buyers, Mr. Hyde prepared and faxed a letter to Mr. Carpenter; the letter was received by Mr. Carpenter on April 11, 1988.

In regard to the consulting portion of the draft noncompetition and consulting agreement, Mr. Hyde's letter suggested adding the following sentence: "Buyer may prepay these payments at any time, without penalty or terminating the

agreement", commenting that this "will allow us to prepay the agreement, without impairing our ability to deduct the payments." Mr. Hyde also suggested, among other things, that the entire paragraph on per diem payment for consulting services be deleted, commenting that the "inclusion of additional consulting fees, especially at this high rate, makes the $675,000 fee look like a sham, and endangers its deductibility."

After the above correspondence and negotiation, the parties entered into an "Addendum to Purchase Agreement and Escrow Instructions" (addendum). The addendum amended the purchase agreement to provide that no portion of the purchase price would relate to goodwill and that "All good will of the business of Seller is not to be assigned any value." The addendum also provided for the execution of a noncompetition and consulting agreement (final agreement) attached to the addendum.

The final agreement provided that the buyers would pay Mr. Wright $675,000 at closing in exchange for his covenant not to compete for a period of 3 years. More specifically, Mr. Wright agreed not to compete with the buyers, directly or indirectly, either as an employer, employee, consultant, agent, officer, director, shareholder, or owner of any entity, for a period of 3 years, in the business of retail sale or repair of Toyota, Ford,

or Suzuki automobiles.[2] Mr. Wright further agreed not to solicit or otherwise encourage any present or future employee of the buyers to perform work in auto sales or repairs for him for a period of 3 years. The covenant not to compete covered a radius of 50 miles around Kirkland, Washington. The final agreement further provided that the consideration of $675,000 paid for the covenant not to compete was not reimbursable in the event of the death or disability of Mr. Wright.

The buyers believed that the noncompetition portion of the final agreement was necessary for a number of reasons. First, the buyers were concerned that Mr. Wright would recruit employees from the Totem Lake dealerships to work in his Chevrolet-Nissan dealership. Second, the buyers were concerned that Mr. Wright would obtain employment from one of the 21 Ford dealerships or 19 Toyota dealerships in the Seattle, Washington, area, where he could use his industry contacts and experience to the detriment of the buyers.

The consulting portion of the final agreement required the buyers to pay Mr. Wright $675,000 in three equal annual installments of $225,000 to secure his services as a consultant for 3 years, or the buyers could prepay this amount at any time without penalty. Mr. Wright's obligation to consult was limited

---

[2] Mr. Wright also owned a low-volume Chevrolet-Nissan dealership in the Seattle metropolitan area. The terms of the Noncompetition and Consulting Agreement did not prevent Mr. Wright from continuing to operate the Chevrolet-Nissan dealership.

to a maximum of 5 days a month, not to exceed 15 days a calendar quarter. Mr. Wright's right to receive $225,000 per year for the consulting portion of the agreement was absolute and unconditional. The buyers could terminate the agreement after 1 year, but the right to terminate was conditioned upon the buyers' full payment of the entire $675,000 to Mr. Wright.

Petitioner contends that the consulting portion of the final agreement was necessary, because it needed Mr. Wright's assistance in dealing with Toyota. In fact, following the purchase of the assets of the Totem Lake dealerships, Mr. Wright did provide consulting services to petitioner. Mr. Zellner, who was the general manager of petitioner after the asset acquisition, talked with Mr. Wright a total of 12 times regarding problems petitioner was having with Toyota, although each conversation lasted less than 20 minutes. In addition to his assistance with Toyota, Mr. Wright also consulted with petitioner regarding financial institutions in the Seattle, Washington, area, but the evidence regarding these consultations is sparse.

As discussed above, the purchase agreement had allocated $200,000 of the buyers' purchase price to goodwill and going concern value. Furthermore, the noncompetition agreement provided that $1,150,000 would be paid to Mr. Wright at closing for his covenant not to compete with the buyers for a period of 3 years. Thus, sometime between March 7, 1988, when Mr. Carpenter sent a letter to Mr. Hyde discussing the purchase agreement, and

the date the addendum and associated final agreement were executed, the parties changed their purchase price allocations. Mr. Blewett testified that he did not know how these changes came about, stating that he "was not involved in that, at all." Similarly, both Mr. Zellner and Mr. Hyde testified that they did not know how the decision was made to make these changes. When asked if he remembered how the changes came about, Mr. Turner testified: "Well, I remember that we didn't understand why there would be any good will. I mean, there was just the opposite." More directly, in regard to the allocation, Mr. Turner testified that "there was no good will."

Petitioner was incorporated on or about March 10, 1988, in the State of Washington. The buyers assigned to petitioner and to Heritage Suzuki, Inc., another Washington corporation owned by them, their interests in the purchase agreement. In connection with the purchase of the assets of the Totem Lake dealerships, petitioner obtained new dealership franchises from Ford Motor Co., Toyota Motor Sales, U.S.A., Inc., and Suzuki Co. of America, and it operated the related dealerships under the names of Heritage Auto Center (Ford-Toyota) and Heritage Suzuki. Following the purchase of the assets of the Totem Lake dealerships, petitioner and Heritage Suzuki, Inc., advertised the fact of new ownership to the public. Disgruntled customers who were picketing the Totem Lake dealerships stopped picketing the day that petitioner and Heritage Suzuki, Inc., took over.

- 14 -

After operating the Suzuki dealership for a short time, petitioner terminated the Suzuki franchise because of adverse consumer reports concerning Suzuki automobiles.  Heritage Suzuki, Inc., discontinued operations as an authorized Suzuki dealer during January 1989, and it was merged into petitioner on March 22, 1989.  Thereafter, petitioner used the Heritage Suzuki facilities for repair services and the sale of used vehicles and parts.

On the E.W. Richardson Dealerships' combined financial statements dated December 31, 1988, and on petitioner's separate financial statements dated December 31, 1989, and December 31, 1990, payment for the final agreement was treated as payment for goodwill and was amortized on a straight-line basis over 40 years.  However, the financial statement treatment was not consistent with petitioner's income tax treatment of the transaction.

The $675,000 allocated to the covenant not to compete was prepaid at closing.  The $675,000 allocated to the consulting agreement was also prepaid at closing.

Petitioner attached Form 8594, Asset Acquisition Statement Under Section 1060, to its Federal income tax return, Form 1120, filed for the taxable year 1988.  On that form, petitioner reported $675,000 for the covenant not to compete and $675,000 for the consulting agreement as the fair market value of intangible, amortizable assets with useful lives of 3 years.  On

its 1988 Federal income tax return, petitioner deducted $187,500 for amortization of the covenant not to compete and $187,500 for amortization of the consulting agreement for a total deduction of $375,000. In 1989 and 1990, petitioner deducted $225,000 for amortization of both the covenant not to compete and the consulting agreement for a total deduction of $450,000 each year.

In the notice of deficiency, respondent disallowed petitioner's 1988 and 1989 deductions. Respondent tentatively allowed petitioner's deductions of $383,165 and $151,023 for the taxable years 1988 and 1989, respectively, for the carryback of a net operating loss (NOL) from petitioner's 1990 Federal income tax return. The NOL reported on petitioner's 1990 Federal income tax return resulted in part from deductions totaling $450,000 for amortization of the amounts allocated to the covenant not to compete and the consulting agreement.

By amended answer, respondent disallowed the 1990 deductions related to the covenant not to compete and the consulting agreement, thereby reducing petitioner's NOL carrybacks to 1988 and 1989 by $450,000. Thus, respondent limited petitioner's claimed NOL for 1988 and 1989 to only $84,188 for 1988.

OPINION

Issue 1. Whether the Final Agreement Is Amortizable

Respondent disallowed petitioner's deductions for the amortization of the final agreement. Respondent argues that the payments were, in substance, payments for the sale of

nonamortizable goodwill or going-concern value.  Petitioner

asserts that such deductions are allowable.

In general, goodwill has been defined as the expectancy that

old customers will resort to the old place of business.  Newark

Morning Ledger Co. v. United States, 507 U.S. ___, ___, 113 S.

Ct. 1670, 1675-1676 (1993); Metallics Recycling Co. v.

Commissioner, 79 T.C. 730, 742 (1982), affd. 732 F.2d 523 (6th

Cir. 1984).  Going-concern value is similar to goodwill in that

it reflects "the additional element of value which attaches to

property by reason of its existence as an integral part of a

going concern."  VGS Corp. v. Commissioner, 68 T.C. 563, 591

(1977).

Amounts paid by a buyer for goodwill or going-concern value

yield capital gain to the seller with the buyer acquiring an

intangible asset that may not be amortized.  Throndson v.

Commissioner, 457 F.2d 1022, 1024 (9th Cir. 1972), affg. Schmitz

v. Commissioner, 51 T.C. 306 (1968); Computing & Software, Inc.

v. Commissioner, 64 T.C. 223, 232 (1975); sec. 1.167(a)-3, Income

Tax Regs.[3]  On the other hand, amounts paid by a corporation for

services, including consulting fees, are includable as ordinary

income by the service provider and deductible by the corporation.

Secs. 162(a)(1), 61; Ruge v. Commissioner, 26 T.C. 138, 143

---

[3]     Compare sec. 197, enacted as part of the Omnibus Budget Reconciliation
Act of 1993, Pub. L. 103-66, sec. 13261(a), 107 Stat. 312, 553, which allows
for 15-year amortization of acquired intangible assets, including, inter alia,
goodwill and going-concern value.  Sec. 197.  This provision generally applies
to intangibles acquired after Aug. 10, 1993.

(1956). Similarly, amounts paid by a buyer for a covenant not to compete result in ordinary income to the covenantor, since they represent a substitute for ordinary income and may be amortized by the buyer over the covenant's useful life. Throndson v. Commissioner, supra at 1024; Ullman v. Commissioner, 264 F.2d 305, 307 (2d Cir. 1959), affg. 29 T.C. 129 (1957); sec. 1.167(a)-3, Income Tax Regs.

The economic substance of a transaction, rather than the form in which it is cast, is controlling for Federal income tax purposes; thus, courts may pierce the form of a transaction and tax the substance. Griffiths v. Commissioner, 308 U.S. 355, 356-357 (1939); Gregory v. Helvering, 293 U.S. 465, 469 (1935). The underlying philosophy of the "substance over form" doctrine is to prevent taxpayers from attempting to subvert the taxing statutes by relying upon mere legal formality. Major v. Commissioner, 76 T.C. 239, 246 (1981). This doctrine is applicable in cases such as the one at bar, where the Commissioner is challenging an express contractual allocation. See Schulz v. Commissioner, 294 F.2d 52, 56 (9th Cir. 1961), affg. 34 T.C. 235 (1960); O'Dell & Co. v. Commissioner, 61 T.C. 461, 467 (1974).[4] The burden of

---

[4] This is not a case where the taxpayer is asserting that the substance of the agreement it entered is at variance with its form. In such a case, courts have either required strong proof that the substance of the agreement was different than its form, or they have limited the type of evidence that a taxpayer may offer when attacking the contractual allocation. E.g., Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965); Ullman v. Commissioner, 264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957).

proving that the form of a transaction should be respected is on the taxpayer.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).[5]

Generally, a contractual allocation will be upheld if it has "economic reality", i.e., some independent basis in fact or some arguable relationship with business reality so that reasonable persons might bargain for such an agreement.  Schulz v. Commissioner, supra at 55.  To determine whether a contractual allocation has economic reality, we examine the facts and circumstances of the particular case.  See id. at 54; Major v. Commissioner, supra at 250.  If the parties to a contract have adverse tax interests, we give more deference to the form of their agreement.  The rationale for this rule was articulated by one court as follows:

> The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money.  [Ullman v. Commissioner, supra at 308.]

However, if the parties to a contract do not have adverse tax interests, we carefully scrutinize their contractual allocations. Schulz v. Commissioner, supra; Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 447-448 (1980); Lemery v.

---

[5]     Respondent has the burden of proof regarding the increased deficiencies asserted in her amended answer, and we have jurisdiction to consider such increased deficiencies.  Sec. 6214(a); Rule 142(a); Rudie v. Commissioner, 49 T.C. 131, 138 (1967).

Commissioner, 52 T.C. 367, 376 (1969), affd. per curiam 451 F.2d 173 (9th Cir. 1971).

When there is a difference between the tax rates applied to ordinary income and capital gains, the tax interests of buyers and sellers in the allocations between goodwill and covenants not to compete or consulting agreements are antithetical. In such instances:

> Sellers [prefer] allocations to goodwill because gain on a sale of goodwill is capital gain, while amounts received for a covenant not to compete are ordinary income. Buyers, in contrast, prefer allocations to covenants not to compete because amounts so allocated can be written off over the period covered by the covenant, whereas the cost of goodwill is not depreciable and produces no tax benefit until the goodwill is sold or lost. * * * [Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 4.4.6, at 4-74 to 4-75 (2d ed. 1993).]

For years in which capital gain and ordinary income are taxed at the same rate, sellers and buyers will generally lack such tax adversity. Sellers will be indifferent as to whether they will be required to recognize capital gain or ordinary income, and hence may have no tax stake in the allocation between goodwill and covenants not to compete or consulting agreements.[6] Buyers, however, will still desire allocations to covenants not to compete or consulting agreements, because such agreements generate tax deductions.

---

[6] A well-noted exception is a seller who has capital losses. See sec. 165(f).

The Tax Reform Act of 1986, Pub. L. 99-514, sec. 101(a), 100 Stat. 2085, 2096, eliminated the tax rate differential between ordinary income and capital gains.  Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 178, 181 (J. Comm. Print 1987).  This lack of a tax rate differential continued through the years at issue.  Sec. 1(a), (j).

In the case at bar, respondent has noted this lack of a tax rate differential, and she argues that the buyers and Mr. Wright did not have adverse tax interests when negotiating the allocations which are the subject of this case.  We agree.  Accordingly, we strictly scrutinize these allocations.  Schulz v. Commissioner, supra; Buffalo Tool & Die Manufacturing Co. v. Commissioner, supra at 447-448; Lemery v. Commissioner, supra at 376.

In this case, the consulting agreement and the covenant not to compete were integrated into a single agreement.  We will consider the consulting agreement and the covenant not to compete separately to determine whether the payments were for the purposes designated by the parties.

a.  Consulting Agreement

Petitioner asserts that it should be entitled to claim deductions for the amortization of the purchase price of the consulting portion of the final agreement (consulting agreement). Respondent determined that the allocation to the consulting

agreement lacked economic significance and was in substance a disguised payment for goodwill or going-concern value.

Petitioner argues that the consulting agreement has economic significance, because it needed Mr. Wright's assistance in dealing with Toyota. We recognize that Mr. Wright had extensive knowledge and experience in dealing with Toyota, and that this knowledge and experience would be helpful to petitioner. Furthermore, Mr. Wright did consult with petitioner's shareholders regarding Toyota.

Respondent argues that petitioner's shareholders would have little, if any, need to consult with Mr. Wright. Petitioner's shareholders had extensive experience in the domestic and imported automobile dealership business, including experience with a Japanese manufacturer. However, petitioner's shareholders had no experience dealing with Toyota.

The negotiations which culminated in the creation of the consulting agreement were conducted between Mr. Richardson and Mr. Wright, neither of whom testified. There was evidence that the buyers rejected the per diem portion of the proposed consulting agreement, because, according to their counsel, it made the consulting agreement look like a "sham". This sparse evidence regarding the negotiation of the consulting agreement does not indicate that the agreement had economic substance. Schulz v. Commissioner, 294 F.2d at 54-55; Buffalo Tool & Die Manufacturing Co. v. Commissioner, supra; Major v.

Commissioner, 76 T.C. 239 (1981).  Furthermore, the fact that the
Mr. Wright's right to receive $225,000 per year for consulting
was absolute and unconditional indicates that the payment was
not, in substance, for consulting services.  See Coven v.
Commissioner, 66 T.C. 295, 304 (1976).

There was no meaningful evidence of the negotiations which
resulted in the allocation of the amounts set forth in the
consulting agreement.  Thus, we examine events subsequent to the
execution of the agreement to determine whether the allocation
had independent economic significance.  The minimal number of
consultations subsequently provided by Mr. Wright, coupled with
the paucity of evidence regarding the nature, scope, and value of
such services, indicates that the allocation of $675,000 did not
have an arguable relationship with business reality.  However, we
recognize that a reasonable person in the position of the buyers
would pay some consideration for a consulting agreement with Mr.
Wright.

On this record, we find that the consulting agreement had a
value of $1,200.  Consequently, only $1,200 of the amount
allocated to the consulting agreement is properly allocable
thereto.  Seaboard Fin. Co. v. Commissioner, 367 F.2d 646, 652
(9th Cir. 1966); Peterson Machine Tool, Inc. v. Commissioner, 79
T.C. 72, 86 (1982), affd. 54 AFTR 2d 84-5407, 84-2 USTC par. 9885
(10th Cir. 1984); cf. Concord Control, Inc. v. Commissioner, 78
T.C. 742 (1982).  Accordingly, petitioner may claim deductions

for the amortization of $1,200 over the term of the consulting agreement. With respect to the remaining portion of the amount allocated to the consulting agreement, we affirm respondent's determination.

    b.  Covenant Not To Compete

Turning to the covenant not to compete contained in the final agreement (covenant), petitioner argues that it is entitled to claim deductions for the amortization of the amounts paid for the covenant. Respondent argues that such deductions are not allowable.

We believe that the buyers were genuinely concerned that Mr. Wright would recruit employees from the Totem Lake dealerships to work in his Chevrolet-Nissan dealership. Furthermore, we believe that the buyers were concerned that Mr. Wright would obtain employment from one of the 21 Ford or 19 Toyota dealerships in the Seattle, Washington, area, where he could use his industry contacts and experience to the detriment of the buyers. These two findings are probative of the economic substance of the covenant. O'Dell & Co. v. Commissioner, 61 T.C. at 469. In addition, the fact that the covenant appears to be genuinely but realistically restrictive, extending over a 50-mile area for a period of 3 years, indicates that the covenant had independent economic significance. Schulz v. Commissioner, supra at 54; O'Dell & Co. v. Commissioner, supra at 469.

Respondent argues that the allocation of $675,000 of the purchase price to the covenant lacked economic significance, noting that Mr. Wright's reputation was so tarnished as to effectively eliminate him as a competitive threat.  Although we agree that Mr. Wright's reputation was tarnished, we nonetheless believe that the buyers were genuinely concerned that he could be a competitive threat.  We believe that a reasonable person in the position of the buyers would bargain for a noncompetition agreement from Mr. Wright.  See Schulz v. Commissioner, supra at 55.  However, taking into account that Mr. Wright suffered such extensive adverse publicity, we do not believe that an allocation of $675,000 is supportable on this record.

We find that the noncompetition covenant had a value of $337,500.  Therefore, $337,500 of the amount allocated to the covenant is properly allocable thereto.  Seaboard Fin. Co. v. Commissioner, supra at 652; Peterson Machine Tool, Inc. v. Commissioner, supra at 86; cf. Concord Control, Inc. v. Commissioner, supra.  Accordingly, petitioner may claim deductions for the amortization of $337,500 over the term of the

covenant.  In regard to the remaining portion of the amount allocated to the covenant, we affirm respondent's determination.

To reflect the foregoing,

<u>Decision will be entered under Rule 155.</u>